## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN E. FREEDMAN and KATE FREEDMAN, as Trustees of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005, | ) ) ) ) | Civil Action No. 1:16-cv-11039 |
| Plaintiffs, | ) | |
| v. | ) ) | Hon. Jorge L. Alonso |
| AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation, | ) ) ) | |
| Defendant. | ) ) | |

## AMENDED COMPLAINT

Plaintiffs Steven E. Freedman and Kate Freedman as Trustees of the Steven and Kate Freedman Living Trust Dated April 20, 2005, a California trust (the "Freedmans"), for their Amended Complaint against Defendant, American Guardian Holdings, Inc. ("AGH" or the "Company"), states:

## GENERAL STATEMENT

1.      On July 1, 2013, AGH, Rogers P. Freedlund, Jr. (as Trustee of the Rogers P. Freedlund Trust) and Joy A. Freedlund (as Trustee of the Joy A. Freedlund Trust and collectively with Rogers P. Freedlund, the "Freedlunds"), and the Freedmans, entered into the Amended and Restated American Guardian Holdings, Inc. Shareholders Agreement (attached as Exhibit A hereto and referred to herein as the "Shareholders Agreement"). Among other things, in the Shareholders Agreement, AGH agreed to: (i) employ Mr. Freedman as an officer, and not terminate him from that position unless first securing the Freedmans' written approval; and (ii) provide the Freedmans with access to AGH's books and records, officers and other reasonably requested financial condition, business prospects and corporate affairs information of AGH.

2.      On November 17, 2016, AGH and the Freedmans entered into a separate written agreement in which AGH agreed to redeem, for $37,605,000, 3,725 shares of American Guarding Holdings Common Stock held by the Freedmans (attached as <u>Exhibit B</u> hereto and referred to herein as the "Purchase Agreement"), with an initial purchase of 1,982 shares on December 31, 2016, and three subsequent purchases of 581 shares each on December 31, 2017, 2018 and 2019.

3.      Shortly after executing the Purchase Agreement, AGH communicated its intent to breach its redemption obligation under the Purchase Agreement. Although the Freedmans thereafter demanded assurances of AGH's performance, and tendered their shares for purchase, AGH failed to purchase the 1,982 shares it had agreed to purchase on December 31, 2016. Additionally, on December 30, 2016, AGH purportedly terminated Mr. Freedman's employment and refused the Freedmans' request for access to AGH's financial and corporate information, books and records, and AGH officers.

4.      As a result of AGH's breach of the Shareholders Agreement, the Freedmans face immediate and irreparable harm. AGH's actions, if allowed to persist, will obliterate the Freedmans' ability to actively monitor their investment in AGH and prevent corporate actions that adversely affect their ownership of, and investment in, AGH in a manner not compensable through the award of money damages (as expressly stated in the Shareholders Agreement). The Freedmans therefore seek specific performance of the Shareholders Agreement and a preliminary and permanent injunction ordering AGH to: (i) provide the Freedmans with reasonable access to, and inspection of, AGH's books and records and other financial condition, business prospects and corporate affairs corporate affairs information in accordance with Sections 15.1 and 15.2 of the Shareholders Agreement; (ii) allow the Freedmans access to AGH's officers to discuss the

Company's affairs, finances and accounts in accordance with Section 15.2 of the Shareholders Agreement; and (iii) reinstate Mr. Freedman's employment with AGH in accordance with Section 16.3 of the Shareholders Agreement.

5.      The Freedmans further seek a declaration of their rights under, and specific performance of, the Purchase Agreement.

**PARTIES**

6.      Plaintiff Steven E. Freedman is a citizen and resident of Puerto Rico.

7.      Plaintiff Kate Freedman is a citizen and resident of Puerto Rico.

8.      American Guardian Holdings, Inc. is an Illinois corporation with its principal place of business in Warrenville, Illinois.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the Freedmans, on one hand, and AGH, on the other hand, are citizens of different states and more than $75,000 is in controversy.

10.      Venue properly lays in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) as AGH has its principal place of business in this District, and a substantial part of the events giving rise to the claims occurred in this District.

**FACTS SUPPORTING COMPLAINT**

11.      On July 1, 2013, AGH, the Freedlunds and the Freedmans, entered into the Shareholders Agreement, an enforceable contract supported by good and valuable consideration.

12.      Pursuant to Section 12(xiv) of the Shareholders Agreement, AGH agreed that, so long as the Freedmans (or others to whom the Freedmans later transferred their shares) held at least 30% of AGH's Common Stock, the Company would not "terminate or change the

employment terms . . . of any . . . officer . . . of the Company," without first obtaining the Freedmans' written approval.

13.    At all points relevant to this Complaint, the Freedmans have held more than 30% of AGH's Common Stock.

14.    At the time the parties entered into the Shareholder Agreement, it was not expected that AGH would pay dividends to shareholders. Instead, the parties contemplated the Freedmans would receive cash compensation for their investment in AGH through the salary AGH would pay to Mr. Freedman in his position as an AGH officer.

15.    Pursuant to Section 16.3 of the Shareholders Agreement, AGH agreed to make Mr. Freedman an employee of the Company not terminable by the Company except for "Cause" as to be defined in an employment agreement the Company would enter into with Mr. Freedman. Section 16.3 further provided that AGH would pay Mr. Freedman at the initial rate of $480,000 per annum, with the Company later to determine salary increases and bonus plans.  From the execution of the Shareholder Agreement until present, AGH employed Mr. Freedman as an officer of the Company.

16.    Pursuant to Section 15.1(d) of the Shareholders Agreement, AGH agreed to deliver to the Freedmans, 30 days prior to the start of each fiscal year, a business plan (consolidated), capital and operating expense budgets, cash flow projections and income and loss projections for the Company and its subsidiaries with respect to such fiscal year, all itemized in reasonable detail and prepared on a monthly basis.

17.    Pursuant to Section 15.1(e) of the Shareholders Agreement, AGH agreed to promptly deliver to the Freedmans information they reasonably requested relating to AGH's financial condition, business prospects and corporate affairs. Pursuant to Section 15.2 of that

agreement, AGH agreed to permit the Freedmans to examine the Company's books of account and records, and to discuss with AGH's officers the Company's affairs, finances and accounts.

18.     On November 17, 2016, Mr. Freedman met with AGH's CEO, Mr. Freedlund, and other AGH's officers and shareholders, as well as the Company's General Counsel, in Warrenville, Illinois.

19.     At that meeting, the parties discussed various issues that Mr. Freedman had with Mr. Freedlund's management of AGH and the Company's treatment of the Freedmans as AGH's minority shareholders.

20.     After those discussions, Mr. Freedlund on behalf of AGH offered to buy the Freedmans' shares of AGH Common Stock over a three year period beginning on December 31, 2016 based on a $98 million valuation of the Company.

21.     Mr. Freedman accepted this offer on behalf of the Freedmans, and the parties set forth the essential terms of the AGH agreement to redeem the Freedmans' shares in the Purchase Agreement. Mr. Freedlund and Mr. Freedman then executed this writing, with the acknowledgement and consent of the other AGH shareholders, officers and General Counsel, to signify the acceptance of AGH and the Freedmans of the Purchase Agreement.

22.     As set forth in the Purchase Agreement, AGH committed to pay $37,605,000 for the Freedmans' 3,725 shares as follows:

| Date | Shares Redeemed | Amount |
|------|-----------------|--------|
| 12/31/2016 | 1,982 | $ 20,000,000.00 |
| 12/31/2017 | 581 | $  5,868,333.00 |
| 12/31/2018 | 581 | $  5,868,333.00 |
| 12/31/2019 | 581 | $  5,868,334.00 |
| **Total** | 3,725 | $ 37,605,000.00 |

- 5 -

23.     On November 21, 2016, AGH sent the Freedmans a draft "Share Redemption Agreement and Termination of Shareholders Agreement," seeking to change and add terms not agreed upon in the Purchase Agreement. The Freedmans rejected AGH offer to change, or add to, the terms of the Purchase Agreement.

24.     When the Freedmans thereafter requested that AGH confirm its intent to comply with the Purchase Agreement as written, AGH stated it would not redeem the shares in accordance with the Purchase Agreement, declaring AGH would redeem the Freedmans' shares only if the essential terms of the Purchase Agreement were changed.

25.     On December 2, 2016, the Freedmans requested AGH to produce the information set forth in Section 15.1(d) of the Shareholder Agreement, as well as provide access to information relating to AGH's financial condition, business prospects and corporate affairs, and specified books of accounts and records, in accordance with Sections 15.1 and 15.2 of the Shareholders Agreement. The Freedmans also requested a meeting with Company officers to discuss the affairs and prospects of the Company in accordance with Shareholders Agreement Section 15.2.

26.     On December 16, 2016, AGH demanded that Mr. Freedman stop having any discussions with Company employees, in particular stating Mr. Freedman should have no further communication with "the Company's customers, dealers, sales representatives, employees, or vendors until further notice from the Company."  When then informed that such a direction violated AGH's commitment in Section 16.1 of the Shareholders Agreement to act in good faith and use its best efforts to ensure the effectiveness and benefits of the  rights granted under the

Shareholders Agreement, AGH only reiterated its demand that Mr. Freedman cut off communications with Company employees.

27.     On December 30, 2016, AGH asserted that it had terminated Mr. Freedman's employment. In doing so, AGH did not seek prior written approval from the Freedmans.

28.     On December 30, 2016, AGH refused to provide the Freedmans access to the information, books and records they requested on December 2, 2016, or to arrange their requested meeting with AGH's officers.

29.     On December 31, 2016, the Freedmans demanded that AGH retract its purported termination of Mr. Freedman and to comply with its obligation to provide the Freedmans with access to Company information and officers. AGH did not do so.

30.     On December 31, 2016, the Freedmans also demanded that AGH fund the first purchase of their shares under the Purchase Agreement indicating they were ready to make the first transfer of shares upon receipt of the funds.

31.     AGH neither funded this purchase on December 31, 2016 nor retracted its purported termination of Mr. Freedman.

## COUNT I
### (Breach of Contract – Purchase Agreement)

32.     The Freedmans reallege and incorporate as if fully set forth herein Allegations 1 to 31.

33.     The Purchase Agreement is a valid contract obligating AGH's redemption of the Freedmans' AGH shares.

34.     On December 31, 2016, the Freedmans tendered to AGH 1,982 shares of AGH Common Stock, and stand ready and able to perform their further obligations under the Purchase

Agreement when due. The Freedmans have fully performed their obligations under the Purchase Agreement.

35.     AGH breached the Purchase Agreement by failing to fund the $20 million purchase of shares on December 31, 2016. AGH further has stated that it will not perform as required under the Purchase Agreement.

36.     In response to requests that it provide assurance of its performance under the Purchase Agreement, AGH manifested a clear, unequivocal intent not to perform under the Purchase Agreement when performance is due. By doing so, AGH has defeated and rendered unattainable the object of the Purchase Agreement, namely the redemption of the Freedmans' share in accordance with the terms of the Purchase Agreement.

37.     Through its breach of the Purchase Agreement, AGH has irreparably harmed and damaged the Freedmans, and denied them the benefits they contracted for in the Purchase Agreement.

38.     The Purchase Agreement concerned the purchase and sale of unique property, namely a minority interest in a private company that cannot be readily liquidated or sold. Further, the Freedmans' continued ownership of their AGH shares will subjugate them to a relationship with AGH that the Purchase Agreement was designed to end. As such, an award of damages is neither an easily ascertainable nor adequate remedy.

WHEREFORE, the Freedmans request that the Court enter judgment in favor of the Freedmans and against AGH, and issue an order:

(a)     Finding that AGH has breached the Purchase Agreement;

(b)     Requiring AGH's specific performance of the Purchase Agreement;

(c)     Awarding the Freedmans' their attorney's fees and costs; and

(d)     Providing for such other relief as the Court deems appropriate.

## COUNT II
### (Breach of Contract – Shareholders Agreement)

39.     The Freedmans reallege and incorporate as if fully set forth herein Allegations 1 to 38.

40.     The Shareholders Agreement is a valid and enforceable contract.

41.     The Freedmans have fully performed all of their obligations under the Shareholders Agreement.

42.     AGH has breached its obligations under the Shareholders Agreement by:

    a.   Terminating Mr. Freedman's employment without obtaining the Freedmans' prior written approval.

    b.   Terminating Mr. Freedman although Mr. Freedman did not commit any act defined as "Cause" in an employment agreement entered into by AGH and Mr. Freedman after the execution of the Shareholders Agreement.

    c.   Terminating Mr. Freedman's salary.

    d.   Refusing to provide the Freedmans with the information they reasonably requested pursuant to Section 15.1 of the Shareholder Agreement.

    e.   Refusing to provide the Freedmans with access to information, books and records, or to Company officers, as required in Section 15.2 of the Shareholders Agreement.

43.     In so breaching the Shareholder Agreement, AGH has deprived the Freedmans of information and access necessary to monitor their minority shareholder investment in AGH, and the management protections AGH agreed to provide the Freedmans so long as they owned at 30% of the AGH Common Stock.

44.     As a result of AGH's breach of the Shareholders Agreement, AGH has caused the Freedmans immediate and irreparable harm. AGH's actions have obliterated, and continue to

obliterate, the Freedmans' ability to monitor their investment in AGH and prevent corporate actions that adversely affect their ownership of, and investment in, AGH in a manner not compensable through the award of money damages, as acknowledged and agreed to in Section 21 of the Shareholders Agreement.

45.     To the extent that AGH is permitted during the pendency of this lawsuit to disturb the status quo by denying the Freedmans access to information, books and records and Company officers, as well as the benefits of having Mr. Freedman continue as an AGH officer and receive a salary in lieu of dividends, the immediate and irreparable harm to the Freedmans will increase daily and may lead to the inability of this Court to issue any meaningful relief to the Freedmans.

WHEREFORE, the Freedmans request that the Court enter judgment in favor of the Freedmans and against AGH, and issue an order:

(a)     Finding that AGH has breached the Shareholder Agreement;

(b)     Reinstating Mr. Freedman's employment as an officer of AGH;

(c)     Ordering AGH to provide the Freedmans access to the information, books and records and Company officers as requested;

(b)     Enjoining AGH from denying the Freedmans the information and access required under Section 15.1 and 15.2 of the Shareholder Agreement, or from terminating Mr. Freedman's employment.

(d)     Awarding the Freedmans' their attorney's fees and costs as the prevailing party and pursuant to Section 32 of the Shareholder Agreement; and

(e)     Providing for such other relief as the Court deems appropriate.

January 5, 2017

STEVEN E. FREEDMAN and KATE
FREEDMAN, as Trustees of the STEVEN
AND KATE LIVING TRUST DATED
APRIL 20, 2005

By:  /s/ Meredith A. Shippee
        One of Their Attorneys

James A. Rolfes (ARDC# 6200271)
Lewis B. Greenblatt (ARDC #1048554)
Claudia L. Cortes (ARDC #6320479)
Meredith A. Shippee (ARDC #6306992)
REED SMITH LLP
10 South Wacker Drive
Chicago, Illinois 60606
312.207.1000
jrolfes@reedsmith.com
lgreenblatt@reedsmith.com
ccortes@reedsmith.com
mshippee@reedsmith.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2017, a true and correct copy of the foregoing **AMENDED COMPLAINT** was served upon the following counsel of record via email and the CM/ECF system.


Daniel P. Shapiro
Matthew M. Holub
Katten Muchin Rosenman LLP
625 W. Monroe Street
Chicago, IL  60661
daniel.shapiro@kattenlaw.com
matthew.holub@kattenlaw.com


By:  /s/ Meredith A. Shippee
      Meredith A. Shippee

# EXHIBIT A

## AMENDED AND RESTATED AMERICAN GUARDIAN HOLDINGS, INC.
## SHAREHOLDERS AGREEMENT

**THIS AMENDED AND RESTATED SHAREHOLDERS AGREEMENT** (this "*Agreement*") is entered into as of this 1st day of July, 2013, by and among AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation (the "*Company*"), ROGERS P. FREEDLUND, JR., AS TRUSTEE OF THE ROGERS P. FREEDLUND, JR. TRUST DATED APRIL 25, 2008 ("*Rogers*"), JOY A. FREEDLUND, AS TRUSTEE OF THE JOY A. FREEDLUND TRUST DATED APRIL 25, 2008 ("Joy"; and together with Rogers, the "*Freedlunds*"), and STEVEN E. FREEDMAN AND KATE FREEDMAN, TRUSTEES OF THE STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005 (the "*Freedmans*"; and together with the Freedlunds, the **"*Initial Shareholders*"**; and together with such other persons who may from time to time become shareholders of the Company and parties to this Agreement in accordance with the terms and conditions hereof, the "*Shareholders*").

**WHEREAS**, pursuant to a Stock Purchase Agreement dated July 1, 2011 entered into between RV AMERICA INSURANCE MARKETING, as purchaser, and Rogers and Joy, as sellers (the "*Stock Purchase Agreement*"), RV AMERICA INSURANCE MARKETING purchased from the Freedlunds a total of 475 shares of the common stock of the Company ("*Common Stock*");

**WHEREAS**, RVA transferred 475 shares of Common Stock to the Freedmans on December 31, 2012;

**WHEREAS**, the parties hereto wish to modify the terms, conditions, rights and obligations with respect to the ownership and management of the Company and other matters relating thereto; and

**NOW, THEREFORE**, for good and valuable consideration the parties amend and restate the Shareholders Agreement in its entirety as follows.

1. **Definitions.**

   For purposes of this Agreement, the following terms have the meanings set forth below:

   (a) "*Affiliate*" means, with respect to any Person, a Person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person.

   (b) "*Family Member*" means with respect to any Person, such Person's spouse, parents, brothers and sisters, sons, daughters, sons-in-law, daughters-in-law and grandchildren, in each case provided such Person has legal capacity and is at least eighteen (18) years of age as of the relevant date.

   (c) "*Freedlund Shareholder*" means Rogers, Joy and their respective direct and indirect transferees, other than the Freedmans.

   (d) "*Illinois Business Corporation Act*" means the Illinois Business Corporation Act of 1983, as amended, or its successor statute, as in effect from time to time.

   (e) "*Involuntary Transfer*" means any Transfer, other than by voluntary act of a Shareholder, or any proceeding or action by or in which any Shareholder shall be deprived or divested of any right, title or interest in or to any Shares or any Shares shall become encumbered, whether or not such Shareholder consents to such proceeding or action, including, without limitation, (a) any seizure under levy of attachment or execution, (b) any foreclosure upon a pledge of, or a security interest, (c) any Transfer in connection with bankruptcy or similar proceedings, (d) any Transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property, (e) any Transfer in connection with the disposition of the community property interest of such Shareholder's spouse, (f) any Transfer to such Shareholder's spouse as a result of the termination of the marital relationship. "*Involuntary Transferee*" shall have a corresponding meaning.

   (f) "*Freedman Shareholder*" means Steven and Kate Freedman and their direct and indirect transferees, other than the Freedlunds and their Family Members and Affiliates.

(g) "**Shares**" means all shares of Common Stock, now owned or hereafter acquired.

(h) "**Transfer**" shall mean any sale, assignment, transfer, gift, pledge, hypothecation, mortgage, encumbrance or other disposition, directly, indirectly, by operation of law or otherwise. "**Transferee**" shall have a corresponding meaning.

(i) "**Unaffiliated Third Party**" means any Person who is not an Affiliate of the Company or an Affiliate or Family Member of any Shareholder.

## 2. Transfer Restrictions

(a) No Shareholder shall Transfer all or any portion of such Shareholder's Shares other than as expressly permitted by this Agreement.

(b) Any Transfer or attempted Transfer of Shares in violation of this Agreement shall be void, no such Transfer shall be recorded on the Company's books and the purported transferee in any such Transfer (including, without limitation, an Involuntary Transferee that does not agree to be bound by this Agreement as required by Section 4) shall not be treated as the owner of such Stock for any purpose.

## 3. Certain Permitted Transfers

(a) Rogers and Joy, without the consent of the Company or the Freedmans, may each Transfer Shares to Rogers P. Freedlund ("**Mr. Freedlund**"), Jr., Joy A. Freedlund or any Family Member of either of such Persons, and any such Transfer shall not be subject to the provisions of Sections 5 or 6 hereof; *provided*, that:

    (i) the Freedlund Shares are transferred, directly or indirectly, to the same transferee;

    (ii) the transferee in each case executes and delivers to the Company and to the Freedmans a Permitted Transferee Shareholder Agreement in the form attached as Exhibit C whereby such Person becomes a party hereto as a "Freedlund Shareholder" and agrees to be bound by all of the terms and conditions set forth in this Agreement (including, without limitation, the transfer restrictions) applicable to the Freedlund Shareholders; and

    (iii) in each such case, such transferee's spouse, if any (and if the transferee is not married, then the transferee), executes and delivers to the Company and to the Freedmans a Spousal Waiver and Consent in the form attached as Exhibit A hereto.

(b) the Freedmans may, without the consent of the Company or the Freedlunds, Transfer Shares to Steven E. Freedman ("**Mr. Freedman**"), Kate Freedman or any Family Member of Mr. Freedman, and any such Transfer shall not be subject to the provisions of Sections 5 or 6; *provided,* that

    (i) the Freedman Shares are transferred, directly or indirectly, to the same transferee;

    (ii) the transferee in each case executes and delivers to the Company and to the Freedlunds a Permitted Transferee Shareholder Agreement in the form attached as Exhibit C whereby such Person becomes a party hereto as a "Freedman Shareholder" and agrees to be bound by all of the terms and conditions set forth in this Agreement (including, without limitation, the transfer restrictions) applicable to the Freedman Shareholders; and

    (iii) in each such case, such transferee's spouse, if any (and if the transferee is not married, then the transferee), executes and delivers to the Company and to the Freedlunds a Spousal Waiver and Consent in the form attached as Exhibit A hereto.

(c) The Freedlund Shareholder may, with the Freedman's prior written consent (such consent not to be unreasonably withheld), Transfer Shares to any Person or Persons; *provided*, that:

    (i)      any Transfer pursuant to this Section 3(c) shall be subject to the provisions of Sections 5 and 6 hereof; and

    (ii)      the transferee in each case (if other than the Freedman's) executes and delivers to the Company and to the Freedmans a joinder to this Agreement whereby such Person becomes a party hereto as a "Freedlund Shareholder" and agrees to be bound by all of the terms and conditions set forth in this Agreement (including, without limitation, the transfer restrictions) applicable to the Freedlund Shareholders; *provided,* that any such transferee that is an Affiliate of the Freedmans. Shall instead become a party hereto an a "Freedman Shareholder"; and

    (iii)      in each such case in which the transferee is an individual, such transferee's spouse, if any (and if the transferee is not married, then the transferee), executes and delivers to the Company and to the Freedman's a Spousal Waiver and Consent in the form attached as Exhibit A hereto.

(d) The Freedman Shareholders may, with the prior written consent of holders of a majority of the Shares held by the Freedlund Shareholders (such consent not to be unreasonably withheld), Transfer Shares to any Person or Persons; *provided,* that:

    (i)      any Transfer pursuant to this Section 3 (d) shall be subject to the provisions of Sections 5 and 6 hereof; and

    (ii)      the transferee in each case (if other than the Freedlunds) executes and delivers to the Company and to the Freedlunds a joinder to this Agreement whereby such Person becomes a party hereto as a "Freedman Shareholder" and agrees to be bound by all of the terms and conditions set forth in this Agreement (including, without limitation, the transfer restrictions) applicable to the Freedman Shareholders; *provided*, that any such transferee that is an Affiliate of the Freedlunds, shall instead become a party hereto as a "Freedlund Shareholder"; and

    (iii)      in each such case in which the transferee is an individual, such transferee's spouse, if any (and if the transferee is not married, then the transferee), executes and delivers to the Company and to the Freedmans a Spousal Waiver and Consent in the form attached as Exhibit A hereto.

**4. Involuntary Transfers.**

(a) Upon the Involuntary Transfer of Shares held by an Shareholder, such Shareholder shall promptly (but in no event later than ten (10) days after such Involuntary Transfer) furnish written notice to the Company and to each other Shareholder (an "***Involuntary Transfer Notice***") indicating that the Involuntary Transfer has occurred, specifying the name of the Involuntary Transferee and giving a detailed description of the circumstances giving rise to and the legal basis for the Involuntary Transfer.

(b) Except as provided in Section 4(b), an Involuntary Transfer shall be void and shall not be recognized by the Company unless the Involuntary Transferee (i) executes and delivers to the Company and each other Shareholder a joinder to this Agreement whereby such Involuntary Transferee becomes a party hereto as a "Freedlund Shareholder" (if the transferror in such Involuntary Transfer was a Freedlund Shareholder) or a "Freedman Shareholder" (if the transferor in such Involuntary Transfer was a Freedman Shareholder) and agrees to be bound by all of the terms and conditions set forth in this Agreement (including, without limitation, the transfer restrictions) applicable to the Freedlund Shareholders or Freedman Shareholders, as the case may be, and (ii) causes his or her spouse to execute and deliver to the Company and each other Shareholder, a spousal waiver in the form of Exhibit A, if such Involuntary Transferee is a natural Person and a resident of a state with a community or martial property system. Such Involuntary Transferee shall, upon his, her or its satisfaction of such

conditions and acquisition of Shares, be a Shareholder, subject to and bound by all of the restrictions and other provisions of this Agreement that had been applicable to the transferor of such Shares with respect to the Shares that were subject to such Involuntary Transfer, including, without limitation, any such provisions that were applicable to the transferor by reason of the transferor being a Freedlund Shareholder or a Freedman Shareholder, as the case may be.

(c) Notwithstanding the foregoing provisions of this Section 4, and except as provided in Section 4(b), at any time within ninety (90) days after the receipt by the Company of an Involuntary Transfer Notice with respect to an Involuntary Transfer or, if no such notice is received, the date that the Company becomes aware of such Involuntary Transfer, the Company, shall have the right to purchase, and at the direction of holders of a majority of the Shares held by the Freedman Shareholders (if the Transferor in such Involuntary Transfer is a Freedman Shareholder), the Company shall purchase, and in such event the Involuntary Transferee for a purchase price equal to the Fair Market Value of such Shares determined as of the date of the Involuntary Transfer.

5.  **Right of First Refusal**.

(a) In the event that a Shareholder (the "***Proposed Transferor***") proposes to Transfer any Shares to a third party (the "***Proposed Transferee***") pursuant to Section 3(c) or Section 3(d), such Proposed Transferor must first give the Company and each of the other Shareholders, including (x) the Freedmans, if the Proposed Transferor is a Freedlund Shareholder, or (y) the Freedlunds, if the Proposed Transferor is a Freedman Shareholder (Freedman, in the case of (x), or the Freedlunds together, in the case of (y), being the "***Non-Selling Shareholder***"), written notice (the "***Offer Notice***") setting forth the number of Shares proposed to be Transferred (the "***Offered Shares***"), the price and the other terms and conditions of the proposed Transfer, and the identity of and other relevant information with respect to the Proposed Transferee, which Offer Notice shall be accompanied by a copy of any written proposal, term sheet, letter of intent or other agreement relating to the proposed Transfer. The Offer Notice shall constitute the Proposed Transferor's irrevocable offer to sell the Offered Shares to the Non-Selling Shareholder on the same financial terms and conditions as are set forth in the Offer Notice (and excluding any terms or conditions that, by their nature, cannot be fulfilled by the Non-Selling Shareholder) (the "***ROFR Terms***").

(b) The Non-Selling Shareholder may elect to purchase, on the ROFR Terms, all, but not less than all, of the Offered Shares, such election to be made by giving written notice thereof (the "***ROFR Acceptance Notice***") to the Proposed Transferor within sixty (60) days following the date that the Non-Selling Shareholder receives the Offer Notice. (If the Freedlunds are the Non-Selling Shareholder and elect to purchase the Offered Shares, they shall allocate the Offered Shares between them in such ratio as they may jointly determine.) In the event that the Non-Selling Shareholder timely elects to purchase the Offered Shares, the closing of such purchase shall occur within one hundred twenty days (120) days following delivery of the ROFR Acceptance Notice to the Proposed Transferor.

(c) Subject to the provisions of Section 6, and the Proposed Transferor's compliance therewith, in the event the Non-Selling Shareholder fails to exercise in a timely manner the right of first refusal provided by this Section 5, then the Proposed Transferor may, during the period commencing sixty-one (61) days following the Proposed Transferor's delivery of the Offer Notice and ending ninety (90) days following the Proposed Transferor's delivery of the Offer Notice (the "***Window Period***"), sell the Offered Shares to the Proposed Transferee at the price and upon the terms and conditions no more favorable to the proposed Transferee than are specified in the Offer Notice. In the event the Proposed Transferor has not sold the Shares to the Proposed Transferee within the Window Period, then the Proposed Transferor may not thereafter sell any Shares without again complying with the provisions of Section 2 and this Section 5.

6.  **Right of Co-Sale**

(a) Notwithstanding anything to the contrary set forth in Section 5(c), in the event that a Proposed Transferor proposes to Transfer any Shares to a Proposed Transferee pursuant to Section 3(c) or

Section 3(d) and such Shares, together with any other Shares previously Transferred or concurrently to be Transferred in a single transaction or series of related or similar transactions, constitute fifty percent (50%) or more of the Shares then held by the Proposed Transferor (such proposed Transfer being a "*Proposed Sale*"; and the Shares proposed to be so Transferred in such Proposed Sale being the "*Tag-Along Shares*"), then (x) each of the Freedman Shareholders, if the Proposed Transferor is a Freedlund Shareholder, or (y) each of the Freedlund Shareholders, if the Proposed Transferor is a Freedman Shareholder (in either such case, the "*Tag-Along Offerees*", shall have a right to participate in such Proposed Sale as provided in this Section 6.

(b) Each Tag-Along Offeree may exercise its right to participate in the Proposed Sale by delivering to the Tag-Along Seller a written notice (a "*Participation Notice*") stating its election to do so and specifying the number of Shares to be sold by it no later than thirty (30) days after receipt of the Sale Notice (each such Tag-Along Offeree so electing to participate in the Proposed Sale being an "*Accepting Shareholder*"). The maximum number of Shares that each Accepting Shareholder will be permitted to include in a Proposed Sale will be the product of (i) the number of Shares then held by such Accepting Shareholder times; (ii) a fraction, the numerator of which shall be the number of Tag-Along Shares and the denominator of which shall be the number of Shares then held by the Tag-Along Seller. Each Accepting Shareholder shall have the right to sell Shares to the Proposed Transferee in any such Proposed Sale; *provided*, that to the extent the sum of the number of Tag-Along Shares plus the aggregate number of Shares of all Accepting Shareholders exceeds the total number of Shares sought to be purchased by the Proposed Transferee, the respective number of Shares of the Tag-Along Seller and each Accepting Shareholder to be included in the sale shall be proportionately reduced based on the number of Shares to be included in the sale by each such selling Shareholder as compared to the Tag-Along Shares and Shares of all Accepting Shareholders.

(c) Upon delivering a Participating Notice, each Accepting Shareholder will, if requested by the Tag-Along Seller, execute and deliver a custody agreement and power of attorney in form and substance reasonably satisfactory to the Tag-Along Seller (a "*Custody Agreement and Power of Attorney*") with respect to the Shares which are to be included in the Proposed Sale pursuant to this Section 6. The Custody Agreement and Power of Attorney will provide, among other things, that the Accepting Shareholders executing such Custody Agreement and Power of Attorney will deliver to and deposit into custody with the custodian and attorney-in-fact named therein a certificate or certificates representing such Shares (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank) and irrevocably appoint such custodian and attorney-in-fact with full power and authority to act under with respect to the matters specified in such Custody Agreement and Power of Attorney. Each Accepting Shareholder participating in a sale subject to this Section 6 shall fully cooperate with the Tag-Along Seller and shall take all necessary actions to effectuate such sale, including, without limitation, entering into agreements and delivering certificates and instruments, all consistent with agreements being entered into and certificates and instruments being delivered by the Tag-Along Seller.

(d) Failure by any Tag-Along Offeree to provide a Participation Notice within the period specified in Section 6(b) shall be deemed to constitute an election by such Shareholder not to exercise its rights pursuant to this Section 6.

(e) Any sale made pursuant to this Section 6 shall be consummated within the Window Period, and in the event that such sale is not consummated within the Window Period, then the Proposed Transferor may not thereafter sell any Shares without again complying the provisions of this Section 6.

7. **Preemptive Rights**

Subject to subsection (iv) of this Section 7, each Shareholder shall have a preemptive right with respect to future sales by the Company of shares of its capital stock. Each time the Company proposes to offer any shares of, or securities convertible into or exchangeable or exercisable for any share of, any class of its capital stock (the "**Securities**"), the Company will offer such Securities to each Shareholder in accordance with the following provisions:

(i)     Not less than thirty (30) days prior to the closing of such offering, the Company will deliver a notice (the "*Preemptive Rights Notice*") to each Shareholder stating the Company's *bona fide* intention to offer such Securities, the class (and series, if applicable) and number of Securities to be offered, the price, terms and conditions of the proposed offering of such Securities, and the manner of sale.

(ii)    By written notification received by the Company within twenty (20) days following delivery of the Preemptive Rights Notice, each Shareholder may elect to purchase or obtain, at the price and on the terms specified in the Preemptive Rights Notice, up to that portion of such Securities that equals the proportion that the number of Shares held by such Shareholder bears to the total number of Shares of Common Stock then outstanding (the "*Preemption Securities*").

(iii)    The preemptive right set forth in this Section are not applicable to (A) the issuance of securities pursuant to a *bona fide,* firmly underwritten public offering of shares of Common Stock, registered under the Securities Act of 1933, as amended, (B) the issuance of securities pursuant to the conversion or exercise of convertible, exchangeable or exercisable securities or as a result of any stock split or stock dividend; or (C) the issuance of securities in connection with a *bona fide* business acquisition by the Company from a third party that is not an Affiliate of any Freedlund Shareholder or Freedman Shareholder.

(iv)    The preemptive rights set forth in the Section are not applicable to (A) the issuance of securities pursuant to a *bona fide,* firmly underwritten public offering of shares of Common Stock, registered under the Securities Act of 1933, as amended, (B) the issuance of securities or securities or as a result of any stock split or stock dividend; or (c) the issuance of securities in connection with a *bona fide* business acquisition by the Company from a third party that is not an Affiliate of any Freedlund Shareholder or Freedman Shareholder.

## 8.  Drag Along Rights

(a)    If at any time Shareholders holding at least a sixty-five percent (65%) of the then outstanding shares of Common Stock (the *"Triggering Shareholders"*) propose to sell or otherwise Transfer (or cause to be sold or otherwise Transferred) to an Unaffiliated third Party (including, without limitation, by way of stock sale, merger, consolidation or otherwise) all of the shares then owned by such Triggering Shareholders (a *"Drag-Along Sale"*) such Triggering Shareholders may require the participation of the other Shareholders (the "*Dragged-Along Shareholders")* in such Transfer of Stock in the manner set forth in this <u>Section 8.</u>

(b)    The Triggering Shareholder shall exercise their rights pursuant to this <u>Section 8</u> by delivering to the company and to each Dragged-Along Shareholder a written notice of such proposed Drag-Along Sale no later than thirty (30) days prior to the proposed closing thereof. Such notice shall make reference to the Dragged-Along Shareholders' obligations hereunder and shall describe in reasonable detail: (i) the number of Shares to be sold by each Triggering Shareholder (ii) the Person to whom such shares are proposed to be sold, (iii), the terms and conditions of the sale, including the consideration to be paid and (iv) the proposed date, time and location of the closing of the Drag Along Sale.

(c)    Each Dragged-Along Shareholder shall be required to sell in the Drag-Along Sale all of the Shares then held by such Dragged-Along Shareholder. All Shares shall be sold for the same consideration and otherwise on substantially the same terms and conditions as apply to the Shares to be sold by the Triggering Shareholders.

(d)    If, at any time, the Triggering Shareholders approve a merger, consolidation, recapitalization, sale of all or substantially all the assets of the company, each Dragged-Along Shareholder shall consent to

and cooperate fully with respect thereto and, without limiting the generality of the foregoing, shall not in any way object to or exercise any appraisal rights in connection with such transaction.

(e) Each Dragged-Along Shareholder shall cooperate fully with the Triggering Shareholders and shall take all necessary actions to effectuate any (i) sale of shares of Stock, (ii) merger, consolidation, recapitalization or sale of assets or (iii) other transaction described in this Section 8, including, without limitation, entering into agreements and delivering certificates an instruments being delivered by the Triggering Shareholders.

(f) In the event that Shareholders are required to provide any representations, warranties or indemnities in connection with a transaction described in this Section 8 (other than representations, warranties and indemnities concerning each Shareholder's valid ownership of its shares of capital stock of the Company, free of all liens and encumbrances, and as to each Shareholder's authority, power and right to enter into and consummate such transaction without violating any other agreement), then, each Shareholder (i) will not be liable for more than its *pro rata* share (based upon the consideration received) of any liability for misrepresentation, breach of warranty or indemnity, and (ii) such liability will not exceed the total consideration received by such Shareholder for or in respect of its shares of the capital stock of the Company.

(g) Promptly after completion of any Drag-Along Sale or other transaction pursuant to this, the Triggering shareholders shall notify the dragged Along Shareholders of such completion and shall furnish evidence of such sale or other transaction (including time of completion) and the terms thereof as such Dragged-Along Shareholders may reasonably request.

## 9. Option to Purchase Additional Shares

(a) The Freedmans shall have the right to purchase from Rogers 35 Shares (the "***Option Shares***") for an aggregate purchase price of $353,684.00, subject to the terms and conditions set forth in this Section 9. Such right (the "***Purchase Option***") shall be exercisable by written notice (an "***Option Exercise Notice***") given to Rogers at any time during the three (3) month period commencing on Mr. Freedlund's Retirement Date (as hereinafter defined), and ending on that date that is three (3) months following such date (the "***Option Window Period***"). The number of Option Shares shall be proportionately adjusted in the event of a stock split, stock dividend or similar event, but in such event, the aggregate purchase price for such Shares shall not be adjusted.

(b) "**Mr. Freedlund's Retirement Date**" means the earliest to occur of (i) the date that Mr. Freedlund ceases to be the Chief Executive Officer of the Company, (ii) the date that Mr. Freedlund ceases to be a full-time employee of the Company, (iii) the date that Mr. Freedlund ceases to be actively involved in the day-to-day operation and management of the Company, (iv) the date that Mr. Freedlund announces his retirement from the Company,(v) the date that the Freedlund Shareholders collectively transfer more than two hundred sixty two of their outstanding shares pursuant to Section 3 of this Agreement, or (vi) the death or permanent disability of Mr. Freedlund; *provided*, that Mr. Freedlund's Retirement Date shall not be deemed to have occurred until Mr. Freedman receives actual knowledge thereof, and Mr. Freedman shall not be deemed to have such actual knowledge until either he acknowledges such actual knowledge in writing (and his delivery of an Option Exercise Notice shall constitute such acknowledgment) or Mr. Freedlund delivers written notice to Mr. Freedman of the relevant retirement event described in clauses (i) through (vi) above.

(c) In the event that the Freedmans exercise the Purchase Option, the closing of the sale and purchase of the Option Shares shall take place at the principal executive offices of the Company (or such other place as may be agreed by Rogers and the Freedmans) not later than sixty (60) days following the Freedmans delivery of the Option Exercise Notice. The purchase price for the Option Shares shall be paid at such closing in cash, by check or wire transfer to an account designated in writing by Rogers, and Rogers will deliver to the Freedmans a certificate or certificates representing such Option Shares (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank).

(d) If Rogers and Joy so agree, they may by written notice to the Freedmans designating that some or all of the Option Shares shall (if the Purchase Option is exercised) be purchased from Joy rather than from Rogers, but any default by Joy shall not relieve Rogers of the obligation to sell all of the Option Shares to the Freedmans.

(e) The provisions of <u>Sections 5</u> and <u>6</u> shall not apply to the sale and purchase of the Option Shares pursuant to this <u>Section 9</u>.

### 10. Board of Directors

(a) Each Shareholder hereby agrees to vote such Shareholder's Shares at regular or special meetings of shareholders and/or give written consent with respect to such Shareholder's Shares (whether now or hereafter acquired) in accordance with, the provision of this Agreement.

(b) The Shareholders will vote at regular or special meetings of shareholders, and/or give written consent with respect to such Shareholder's Shares, to ensure that the size of the Board of Directors of the Company (the "**Board**") shall be set and remain at two (2) directors.

(c) On all matters relating to the election of one or more directors of the Company, each Shareholder will vote at regular or special meetings of shareholders and give written consent with respect to such Shareholder's Shares as may be necessary to elect individuals to the Board

(d) On all matters relating to the removal of one or more directors of the Company, each Shareholder will vote at regular or special meetings of shareholders and/or give written consent with respect to such Shareholder's Shares, as may be necessary to remove form the Board any director selected for removal

(e) The Board shall meet at least once per calendar quarter, unless otherwise approved by the Board. A quorum for any meeting of the Board shall require a majority of the directors. At any meeting of the Board, directors may attend in person or participate via conference telephone call as contemplated by the Bylaws of the Company.

(f) The Board shall not take any action by written consent in lieu of a meeting unless such written consent if unanimous (notwithstanding any provision of the Company's articles of incorporation or by-laws or the Illinois Business Corporation Act that would permit the directors to act by the written consent of a a majority (or some other percentage) of the directors).

(g) Should the provisions of this Agreement be construed to constitute the granting of proxies, such proxies will be deemed coupled with an interest and are irrevocable for the term of this Agreement.

(h) No Shareholder may enter into any agreement or arrangement with any Person on terms inconsistent with the provisions of this Agreement.

### 11. Shareholder Meetings and Action by Written Consent

The Shareholders agree that (i) they shall not hold any annual or special shareholders meeting unless such meeting is attended by holders of at least sixty percent (60%) of the total number of outstanding shares of Common Stock (notwithstanding any provision of the Company's articles of incorporation or by-laws or the Illinois Business Corporation Act that would permit a meeting of shareholders to convene with a quorum consisting of the holders of a lesser percentage of the outstanding shares of Common Stock); and (ii) they shall not take shareholder action by written consent unless such written consent is executed by holders of at least sixty percent (60%) of the total number of outstanding shares of Commons Stock (notwithstanding any provision of the Company's articles of incorporation or by-laws or the Illinois Business Corporation Act that would permit holders of a lesser percentage fop the outstanding shares of Common Stock to act by written consent).

**12. Restrictions on Certain Corporate Actions**

So long as the Freedman Shareholders hold, in the aggregate, at least thirty percent (30%) of the then outstanding shares of Common Stock, the Company will not without first obtaining the written approval of the holders of at least a majority of the Shares held by the Freedman Shareholders, take any action (including, without limitation, approving or committing the Company to take and action), or permit any direct or indirect subsidiary of the Company to take any action, with respect to any of the following (each, a **"*Material Management Decision*"**):

- (i) amend its articles of incorporation, including, without limitation, to authorize, or alter or change any of the rights, preferences or privileges of, or the qualifications, limitations or restrictions with respect to, any class or series of capital stock;

(ii) amend its by-laws or adopt new by-laws;

(iii) authorize, create, issue, grant or obligate itself to issue or grant, any shares or capital stock or other equity security, including any other security (equity or non-equity) convertible into or exercisable or exchangeable for any equity security;

(iv) effect any reclassification or recapitalization of capital stock;

(v) enter into any agreement, arrangement or transaction outside of the ordinary course of business as heretofore conducted by the Company (or such subsidiary, as the case may be);

(vi) make or commit to make any capital expenditures in excess of $1,000,000.00 in the aggregate in any calendar year;

(vii) increase or decrease the size of the Board;

(viii) declare or pay dividends or make other distributions on the capital stock of the company;

(ix) redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any shares of the Company's capital stock;

(x) acquire any other business or assets (outside of the ordinary course of business as heretofore conducted) or securities of any other Person;

(xi) merge or consolidate with or into any other Person (whether or not the Company or the relevant subsidiary is the surviving entity of such merger or consolidation);

(xii) incorporate, organize or otherwise create any new director or indirect subsidiaries;

(xiii) sell, transfer or otherwise dispose of any assets outside of the ordinary course of business as heretofore conducted by the Company;

(xiv) hire, terminate or change the employment terms (including any unreasonable increase in compensation not in the ordinary course of business) of the Company's chief executive officer, the chief financial officer, or any other officer or management-level employee of the Company or any of its subsidiaries;

(xv) enter into any agreement, arrangement or transaction (not in the ordinary course of business) with any officer, director, employee or shareholder of the Company or its subsidiaries, or any of their Family Member or Affiliates of any such Person (including, without limitation, any Family Member or Affiliate of any officer, director or trustee of a Shareholder), other than the payment of salary or compensation to employees in the ordinary course of business as heretofore conducted by the Company or the relevant subsidiary; or

(xvi) file a petition for relief under the U.S. Bankruptcy Code.

13. **Put Right**

    (a) Upon the occurrence of any of the following, the Freedman Shareholders may, by written notice to the Freedlunds (a "*Put Notice*"), elect to require the Freedlunds to purchase (the "*Put Right Purchase*") all, but not less than all, of the Shares held by the Freedman Shareholders (the "*Put Right*"), as provided in accordance with the terms of this <u>Section 13</u>.

        (i) Any material breach by the Freedlund Shareholders of their respective obligations under this Agreement;

        (ii) Any Deadlock (as hereinafter defined) occurs and such Deadlock, and/or one or more other Deadlocks, remain unresolved for a period of at least thirty (30) days (*i.e.* if one or more Deadlocks exist for a period of thirty (30) consecutive days); or

    (b) A "*Deadlock*" shall be deemed to occur if the Company (whether acting through the Board, the Freedlunds or otherwise) request that the Freedmans consent to a Material Management Decision and the Freedmans fail to do so. A Deadlock shall be deemed to be resolved upon the earlier to occur of (i) The Freedmans consenting to the Material Management Decision or (ii) the Company withdrawing its request for such consent.

    (c) The obligations of the Freedlunds to purchase the Freedman Shareholder's Shares pursuant to the Put Right shall be joint and several. Such Shares may be purchased directly by either or both of the Freedlunds, or some or all of such Shares may be purchased by one or more designees of the Freedlunds, which may include the Company (collectively, the "*Put Right Purchaser*"); *provided, however,* that the obligation to pay the purchase price for such Shares shall be the joint and several obligation of the Freedlunds and any such other Put Right Purchaser.

    (d) The purchase price for the Shares to be purchased pursuant to the Put Right shall be equal to the Fair Market Value (as hereinafter defined) of such Shares, determined as of the date of the Put Notice. The closing of the purchase of Shares pursuant to this <u>Section 13</u> (the "*Put Right Closing*") shall take place at the principal executive offices of the Company (or such other place as may be agreed by the relevant parties) not later than one hundred twenty (120) days following the determination of the Fair Market Value of the Share pursuant to <u>Section 14</u>. The Put Right Purchaser shall pay for fifty percent (50%) of the Fair Market Value of the Freedman Shareholder's Shares to be purchased pursuant to this <u>Section 13</u>, payable, by delivery at the Put Right Closing of a cashier's check or wire transfer of immediately available funds. The remaining balance for the Fair Market Value of the Freedman Shareholder's Shares shall be paid in equal monthly installments over the next thirty six (36) months.

14. **Fair Market Value**

    (a) "**Fair Market Value**" shall mean, with respect to any Shares as of a particular date, the fair market value of such Shares as of such date as determined by the mutual agreement of the Freedmans and the Freedlunds; *provided, however,* that if such Persons do not agree as to the fair market value of such Shares, then at either such party's request, the Company shall retain an Independent Appraiser (as hereinafter defined) to determine the fair market value of such Shares. Such Independent Appraiser shall be instructed to present its conclusions within thirty (30) days and to use one or more valuation methods that, in its best professional judgment, would be most appropriate to ascertain the Fair Market Value of the Stock in question; *provided, however,* that the Independent Appraiser shall not take into account any discount by reason of the subject Shares being a minority and non-controlling interest.

    (b) The "**Independent Appraiser**" retained pursuant to this <u>Section 14</u> shall be a qualified, independent, professional business appraiser, not affiliated with the Company or any Shareholder (and not, within the preceding five (5) years, been hired or retained by the Company or any Shareholder for any purpose), with at least ten (10) years' experience appraising business in the industries in which the Company operates

(which experience requirement may be waived by mutual agreement of the relevant parties). The Independent Appraiser shall be selected by mutual agreement of the relevant Shareholders and the fees and expenses of such Independent Appraiser shall be paid by the Company; *provided,* that if such parties cannot agree on an Independent Appraiser, then the Freedmans and the Freedlunds shall each, at its own cost and expense, select an appraiser meeting the foregoing qualifications, and the two appraisers so selected shall together select a third appraiser meeting such qualifications, which third appraiser shall be the "Independent Appraiser."

## 15. Access to Information
### 15.1 Delivery of Financial Statements
The Company will deliver to each Shareholder:

- (a) As soon as practicable, but in any event within one hundred eighty (180) days after the end of each fiscal year of the Company, an audited (consolidated) balance sheet of the Company and its subsidiaries as of the end of such fiscal year and the related audited (consolidated) statement of income, shareholders' equity and cash flows for the fiscal year then ended, prepared in accordance with generally accepted accounting principles (**"GAAP"**), and certified by a firm of independent public accountants selected by the Board of Directors of the Company;

- (b) As soon as practicable, but in any event within forty-five (45) days after the end of each of the first three (3) quarterly accounting periods in each fiscal year a (consolidated) balance sheet of the Company and its subsidiaries as of the end of such fiscal quarter, and the related (consolidated) statements of income, shareholders' equity and cash flows for such fiscal quarter and for the fiscal year-to-date, in each case with comparative statements for the prior fiscal year period, and the projected budget, unaudited but prepared in accordance with GAAP consistently applied (other than normal year-end audit adjustments);

- (c) As soon as practicable, but in any event within forty five (45) days after the end of each month in each fiscal year (other than the last month in each fiscal year)a (consolidated) balance sheet of the Company and its subsidiaries, and the related (consolidated) statements of income, shareholders' equity and cash flows, unaudited but prepared in accordance with GAAP and certified by the chief financial officer of the Company, such (consolidated) statements of income, shareholders' equity and cash flows to be for such month and for the period from the beginning of the fiscal year to the end of such month, in each case with comparative statements for the prior fiscal year, and the projected budget; and, at the time of delivery of each such monthly statement, a management narrative report explaining all significant variances from forecasts and all significant current developments in staffing, marketing, sales and operations;

- (d) As early as practicable, but in any event at least no later than thirty (30) days prior to the start of each fiscal year, a business plan (consolidated) capital and operating expense budgets, cash flow projections and income and loss projections for the Company and its subsidiaries in respect of such fiscal year, all itemized in reasonable detail and prepared on a monthly basis, and, promptly after preparation, any revisions to any of the foregoing;

- (e) Promptly from time to time, such other information relating to the financial condition, business prospects or corporate affairs of the Company as such Shareholder may from time to time reasonably request.

### 15.2 Inspection.
The Company will permit each Shareholder at such Shareholder's expense, to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times as may be reasonably requested by the Shareholder, *provided, however,* that the Company may require the Shareholder to execute a confidentiality and nondisclosure agreement prior to any such visit and inspection.

### 16. Other Covenants of the Company

### 16.1 General

The Company agrees to use its best efforts to ensure that the rights granted hereunder are effective and that the parties hereto enjoy the benefits thereof. The Company will not, by a voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all of the provisions of this Agreement and in the taking of all such actions as may be necessary, appropriate or reasonably requested by the holders of the majority of the outstanding voting securities held by the parties hereto assuming conversion of all outstanding securities in order to protect the rights of the parties hereunder against impairment.

### 16.2 Notice of Litigation

The Company will provide notice to the Freedman Shareholders promptly upon the filing of any material action, suit or proceeding by or against the Company.

### 16.3 Company Employment

Mr. Freedman and Mr. Freedlund shall be employees of the Company on terms acceptable to the Company,, which such employment terms shall provide (among other mutually agreeable terms):

> (i) a salary payable to each of Mr. Freedman and Mr. Freedlund at the initial rate of $480,000 per annum (payable from the effective date of this Agreement).

> (ii) annual salary increases and bonus plans for Mr. Freedman and Mr. Freedlund will be determined by the Company.

> (iii) Neither Mr. Freedman's nor Mr. Freedlund's employment shall be terminable by the Company other than for "Cause", as such term shall be defined in such employment agreement.

### 17. Legends on Stock Certificates.

> (a) In addition to compliance with the terms of this Agreement, no transfer of Shares may be made except in compliance with applicable federal and state securities laws. Accordingly, each certificate representing Shares now or hereafter held by or issued to any shareholder will have placed thereon a legend to such effect.

> (b) In addition to the foregoing, each certificate representing shares of capital stock of the Company subject to this Agreement will bear a legend referencing this Agreement and the transfer restrictions and other restrictions to which such shares are subject by reason of this Agreement.

### 18. Amendments and Waivers.

Any term of this Agreement may be amended and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of (i) the Company, (ii) the holders of at least a majority of the then outstanding shares of Common Stock held by the Freedlund Shareholders, and (iii) the holders at least a majority of the then outstanding shares of Common Stock held by the Freedman Shareholders. Any amendment or waiver so effected will be binding upon the Company and each Shareholder, whether or not such Shareholder entered into or approved such amendment or waiver.

### 19. Successors and Assigns.

The provisions of this Agreement will inure to the benefit of and be binding upon the successors in interest, heirs and assigns of the parties hereto. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**20. Stock Splits, Stock Dividends, etc.**
In the event of any issuance of shares of the Company's voting securities hereafter to any of the parties hereto, such shares will become subject to this Agreement and will be endorsed with the legends set forth in Section 17.

**21. Specific Enforcement.**
Each party hereto agrees that its obligations hereunder are necessary and reasonable in order to protect the other parties to this Agreement, and each party expressly agrees and understands that monetary damages would inadequately compensate an injured party for the breach of this Agreement by any party, that this Agreement will be specifically enforceable, and that, in addition to any other remedies that may be available at law, in equity or otherwise, any breach or threatened breach of this Agreement will be the proper subject of a temporary or permanent injunction or restraining order, without the necessity of proving actual damages. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

**22. Enforceability; Severability.**
The parties hereto agree that each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law. If one or more provisions of this Agreement are nevertheless held to be prohibited, invalid or unenforceable under applicable law, such provision will be effective to the fullest extent possible excluding the terms affected by such prohibition, invalidity or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement. If the prohibition, invalidity or unenforceability referred to in the prior sentence requires such provision to be excluded from this Agreement in its entirety, the balance of the Agreement will be interpreted as if such provision were so excluded and will be enforceable in accordance with its terms. If necessary, the parties will, to the extent permissible by applicable law, amend this Agreement so as to make effective and enforceable the intent of this Agreement.

**23. Termination.**
The provisions of this Agreement will terminate upon the earlier to occur of:

> (i) an agreement in writing signed by the holders of at least a majority of Shares then held by the Freedlund Shareholders and at least a majority of the Shares then held by the Freedman Shareholders;

> (ii) the closing date of the firm commitment underwritten public offering of the Company's Common Stock pursuant to an effective registration statement under the Securities Act of 1933, as amended; and

> (iii) the liquidation, dissolution or winding up of the business operations of the Company.

**24. Waiver of Jury Trial.**
**EACH PARTY HERETO HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THE AGREEMENT OR THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS TO (OR ASSIGNMENTS OF) THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL (WITHOUT A JURY) BY THE COURT.**

### 25. Further Assurances

The Company and each Shareholder shall from time to time and at all times hereafter make, do, execute, or cause or procure to be made, done and executed such further acts, deeds, conveyances, consents and assurances without further consideration, which may reasonably be required to effect the transactions contemplated by this Agreement.

### 26. Entire Agreement.

This Agreement and the documents referred to herein constitute the entire agreement among the parties with respect to the subject matter hereof and no party will be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein.

### 27. Delays or Omissions

No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, or upon any breach or default of any other party under this Agreement, will impair any such right, power or remedy of such non-breaching or non-defaulting party nor will it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default to be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any provisions or conditions of this Agreement, must be in writing and will be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, will be cumulative and not alternative.

### 28. Counterparts

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and same instrument.

### 29. Captions and Headings

The captions and headings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

### 30. Notices

Unless otherwise provided herein, all notices, requests, waivers and other communications made pursuant to this Agreement must be in writing and will be conclusively deemed to have been duly given (a) when hand delivered to the other party; (b) three business days after deposit in the U.S. mail, postage prepaid and addressed to the other party at the address set forth on Exhibit B hereto; or (c) the next business day after deposit with a national overnight delivery service, postage prepaid, addressed to the parties at the address set forth on Exhibit B hereto with next business day delivery guaranteed. A party may change or supplement the addresses given below, or designate additional addresses, for the purposes of this Section 30 by giving the other party written notice of the new address in the manner set forth above.

### 31. Governing Law; Venue

Except to the extent that provisions of this Agreement are necessarily governed by the Illinois Business Corporation Act, this Agreement is to be construed in accordance with and governed by the internal laws of the State of Illinois without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction to the rights and duties of the parties. Each of the parties hereto hereby submits to the nonexclusive jurisdiction of the United States District Court for the Northern District of Illinois located in Cook County and of any Illinois state court sitting in the County of DuPage for purposes of all legal proceedings arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the parties irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

### 32. Expenses

If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonably attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

*(Signature page follows)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Shareholder Agreement of American Guardian Holdings, Inc. as of the date first above written.

**COMPANY:**

**AMERICAN GUARDIAN HOLDINGS, INC.**

By: _____

Name: Rogers P. Freedlund, Jr.
Its: President

**SHAREHOLDERS:**

ROGERS P. FREEDLUND, JR., AS TRUSTEE OF THE
ROGERS P. FREEDLUND, JR. TRUST DATED APRIL 25,
2008

By: _____
       Rogers P. Freedlund, Jr.

JOY A FREEDLUND, AS TRUSTEE OF THE JOY A
FREEDLUND TRUST DATED APRIL 25, 2008

By: _____
       Joy A. Freedlund

STEVEN E. FREEDMAN AND KATE FREEDMAN,
TRUSTEES OF THE STEVEN AND KATE LIVING TRUST
DATED APRIL 20, 2005

By: _____
       Steven Freedman

By: _____
       Kate Freedman

15

**IN WITNESS WHEREOF,** the parties hereto have executed this Shareholder Agreement of American Guardian Holdings, Inc. as of the date first above written.

**COMPANY:**

AMERICAN GUARDIAN HOLDINGS, INC.

By:

Name: Rogers P. Freedlund, Jr.
Its: President

**SHAREHOLDERS:**

ROGERS P. FREEDLUND, JR., AS TRUSTEE OF THE
ROGERS P. FREEDLUND, JR. TRUST DATED APRIL 25,
2008

By:

Rogers P. Freedlund, Jr.

JOY A FREEDLUND, AS TRUSTEE OF THE JOY A
FREEDLUND TRUST DATED APRIL 25, 2008

By: _____

Joy A. Freedlund

STEVEN E. FREEDMAN AND KATE FREEDMAN,
TRUSTEES OF THE STEVEN AND KATE LIVING TRUST
DATED APRIL 20, 2005

By:

Steven Freedman

By:

Kate Freedman

15

# EXHIBIT B

Freedman Buyout

Original Investment on 7/1/2011 for 4,750 shares      $ 4,500,000.00
Repurchase of 975 shares for $7,718,696.50

Remaining shares (4,750-975= 3,725)

Valuation of American Guardian      $ 98,000,000.00

Freedman ownership percentage      37.25%

Freedman's Value @ 37.25%      $ 36,505,000.00
     $ 1,100,000.00
     $ 37,605,000.00

| Proposed buyout | | Shares Redeemed | |
|---|---|---|---|
| | 12/31/2016 | 1,982 | $ 20,000,000.00 |
| | 12/31/2017 | 581 | 5,868,333.00 |
| | 12/31/2018 | 581 | 5,868,333.00 |
| | 12/31/2019 | 581 | 5,868,334.00 |
| | | 3,725 | $ 37,605,000.00 |