# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STEVEN E. FREEDMAN and KATE FREEDMAN, as Trustees of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005,<br><br>      Plaintiffs,<br><br>v.<br><br>AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation,<br><br>      Defendant.<br>_____<br><br>AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation, and AMERICAN GUARDIAN WARRANTY SERVICES, INC. an Illinois corporation<br><br>      Counter Plaintiffs,<br><br>v.<br><br>STEVEN E. FREEDMAN, individually and as Trustee of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005<br><br>      Counter Defendant. | Civil Action No. 1:16-cv-11039<br><br>Hon. Jorge L. Alonso |

## MEMORANDUM OPINION AND ORDER

Defendant/counter-plaintiff American Guardian Holdings, Inc. ("AGH"), moves for summary judgment on its Second Amended Counterclaim, contending that plaintiff/counter-defendant Steven Freedman materially breached the restrictive covenants of their settlement agreement. For the reasons set forth below, the motion is denied.

## BACKGROUND

AGH sells vehicle service contracts, also known as extended warranties, to retail car purchasers through the finance and insurance ("F&I") departments of car dealerships across the country. (Freedman LR 56.1 Resp. ¶ 5, ECF No. 307.) In 2011, Freedman, who then owned a recreational vehicle insurance brokerage and has held interests in a number of insurance-related companies throughout his career, invested $4.5 million in AGH. (*Id.* ¶ 7; AGH LR 56.1 Resp. ¶ 2, ECF No. 328.)

On November 17, 2016, intending to redeem his shares in AGH, Freedman met with Rogers Freedlund, AGH's chief executive officer ("CEO") and majority shareholder, to discuss a share price for the transaction. (Freedman LR 56.1 Resp. ¶ 10; AGH LR 56.1 Resp. ¶ 8.) The parties do not agree on what happened at the November 16 meeting. Freedman claims to have accepted a written offer setting forth specific terms based on a specific valuation of AGH. But according to AGH, Freedman "*tentatively* agreed to a *proposed* valuation of [his] shares that would become part of a full redemption agreement, to be negotiated and agreed upon" at a later date. (Freedman LR 56.1 Resp. ¶ 10 (emphasis added); *see* AGH LR 56.1 Resp. ¶ 8.)

The parties wrangled over the final deal terms in the following weeks, but when they could not reach agreement, Freedman filed this suit, seeking to enforce the terms of the November 17, 2016 agreement. (AGH LR 56.1 Resp. ¶ 11.) AGH counterclaimed, asserting that Freedman had breached duties and obligations owed to AGH by surreptitiously competing against the company and diverting business opportunities, including by setting up American Integrity Insurance Solutions, Inc., a personal and commercial insurance lines agency for his son, Max, to run as president and CEO. (Freedman LR 56.1 Resp. ¶ 14, *see id.* ¶ 9; AGH LR 56.1 Resp. ¶ 6.)

Following a settlement conference before Magistrate Judge Rowland in July 2017, the parties reached a settlement agreement, which they executed on October 2, 2017. (Freedman LR 56.1 Resp. ¶¶ 15-16; AGH LR 56.1 Resp. ¶ 13.) The agreement required AGH to pay Freedman $15 million and Max $1.5 million on October 13, 2017, and to provide Freedman with two notes, one for $12 million, payable in three installments of $4 million due on October 13, 2018, October 13, 2019, and October 13, 2020, and the other for $3 million due on October 13, 2021. (AGH LR 56.1 Resp. ¶ 14.) The agreement contains certain restrictive covenants, including non-competition, non-solicitation, and non-interference provisions, "without [which AGH] would not [have] enter[ed] into [the] Agreement." (AGH LR 56.1 Stmt. Ex. 16, Confidential Redemption, Settlement and Mutual General Release Agreement ("Settlement Agreement"), § 2(A), (B), ECF No. 289-16.) The provisions restricting Freedman's business activities read as follows:

> (iii) Covenant Not To Compete. In furtherance of this Agreement, . . . the Freedmans covenant and agree that, during the Restricted Period [of three years for Max and four for Freedman], they will not, either individually or together, nor will they permit any of their employees or affiliated companies, to, directly or indirectly, individually or as an investor, lender, owner, security-holder, partner, member, director, manager, officer, employee, consultant, representative, or agent of any other person or entity: (a) engage in the [vehicle service contract] Business in the Territory [of the United States]; (b) invest in any entity that is engaged in the Business in the Territory or that is or may reasonably be considered to be competitive with the Business or any portion thereof in the Territory; (c) provide services, or receive any compensation, consideration, discount, revenue or other compensation or economic benefit, in connection with the efforts of any person or entity to engage in the Business in the Territory or any business that may reasonably be considered to be competitive with the Business, or any portion thereof, in the Territory.

> (iv) Non-Solicitation. Without limiting the generality of the provisions of Section 2(A)(iii) above, the Freedmans hereby covenant and agree that during the Restricted Period they will not, nor will they permit any of their employees or affiliated companies to, directly or indirectly: (a) Do business with any person or entity that was a Company Group agent, marketing representative or Covered Dealer within the one-year period beginning on October 14, 2016 and ending on the Initial Payment Date, or from any successor in interest to any such person or entity; or (b) Solicit any person or entity that was a Company Group agent,

3

marketing representative or Covered Dealer within the one-year period beginning on October 14, 2016 and ending on the Initial Payment Date, or from any successor in interest to any such person or entity, for the purpose of securing any business.

(v) Interference with Relationships. During the Restricted Period, the Freedmans shall not directly or indirectly (including through an entity they own or for which they work) employ, engage, recruit, solicit, contact or approach for employment or engagement, any person or entity that, on or within the one (1) year period immediately preceding the Initial Payment Date, served as (A) a vendor that is material to the conduct of the Company Group's business, or (B) an employee or independent contractor of the Company Group, or otherwise seek or attempt to influence or alter any such person's or entity's relationship with the Company Group.

(*Id*. § 2(A).) Max is bound by similar covenants. (*Id.* § 2(B)(i-iii)).

In October 2017, Max Freedman attended a trade show as part of an effort to connect Capital Benefits Group, Inc., an "agency representing life, health, and property-casualty products to corporations" (AGH LR 56.1 Stmt. Ex. 43, Capital Automotive Rule 30(b)(6) Dep. at 43:6-7), with Route 66, an association of approximately 150 recreational vehicle dealerships that operates as a buying cooperative, about offering the "TravaDoc" product at Route 66 dealerships. (Freedman LR 56.1 Resp. ¶ 52.) TravaDoc was a subscription service that provided telephone access to a physician. (*Id.*) Capital Benefits Group is one of the Capital Companies, a group of insurance-related businesses owned and controlled by Rick Hughes. (*Id.* ¶¶ 52, 61.) The Capital Companies also include Capital Automotive, Inc., which is an AGH agent, meaning that it sells vehicle service contracts to automobile dealers on behalf of AGH. (*Id.*) Rick Hughes attended the trade show with Dan Archer, a Capital Benefits Group employee, where they met with Max Freedman. (*Id.*)

On November 9, 2017, Bob Shepard of the Capital Companies sent Max a Referral Agreement between AIIS and Capital Benefits Group, as well as an Agency Agreement between AIIS and Capital Processing Systems. (*Id.* ¶ 53.) Max did not sign and return the Agency

4

Agreement, but he did sign and return the Referral Agreement, which provided that AIIS got a "$3 referral fee per TravaDoc [subscription] for representing that product." (*Id.* ¶¶ 53-54.) No evidence confirms whether AIIS ever received payment of any fees for TravaDoc subscriptions under the Referral Agreement, and if it did, the amount would have been vanishingly small, perhaps less than "a hundred dollar[s]" (AGH LR 56.1 Stmt. Ex. 39, Rick Hughes Dep. at 81:3-7, ECF No. 290-9), as Capital Benefits Group quickly discontinued the product due to low sales. (Freedman LR 56.1 Resp. ¶ 52.)

In December 2017, Shepard and Freedman corresponded about an opportunity for Freedman to invest in a Capital Companies product that included vehicle service contracts. (*Id.* ¶ 58.) Freedman was initially interested, but he "wasn't sure" whether he could accept the opportunity without violating the Settlement Agreement, and ultimately, after consulting with counsel, he declined to invest. (*Id.* ¶ 59.) Freedman also maintained contacts about business opportunities with AGH employee Bob Feinen and Capital Companies employee Michael Fischer, but the record of his communications with those employees is incomplete due to Freedman's practice of deleting communications soon after reading them as a matter of course. (*Id.* ¶¶ 40-45.)

In late 2017 and early 2018, Del Healy, an AIIS sales representative, appeared to collaborate with Dan Archer on selling garage liability and garagekeepers workers' compensation insurance products to car dealerships. (*Id.* ¶¶ 63-64, 74.) Specifically, Healy and Archer corresponded via email about quotes for the Kevin Powell dealerships and Folger Automotive/Williams Buick GMC (*id.* ¶¶ 72-73), and Healy submitted an expense report for taking the chief financial officer of Riverside Chevrolet in Jacksonville, Florida, out to lunch in December 2017 for the purpose of "looking at prospect[s] for Garage Insurance for Capital Companies" (*id.* ¶ 74). All three dealers are on the Settlement Agreement's list of "Covered

5

Dealers," *i.e.*, dealers who fall within the scope of the agreement's restrictive covenants because they are AGH customers.[1] (*Id.* ¶¶ 73-74.) Neither Healy nor anyone else at AIIS ever actually obtained or prepared quotes for the Kevin Powell or Folger/Williams dealerships (AGH LR 56.1 Resp. ¶¶ 38-39), nor is there evidence that AIIS ever actually requested or provided quotes to "Capital Companies" for Riverside Chevrolet (Freedman LR 56.1 Resp. ¶ 74).

In December 2017, AGH learned that Freedman met with Zach Hughes, an AGH employee and the son of Rick Hughes. (*Id.* ¶ 34.) The parties dispute the nature and purpose of Freedman's meeting with Hughes, but Freedman describes the meeting as follows. Freedman and Zach have maintained a personal relationship dating back to 2015 or 2016, before this lawsuit was filed, in which Freedman has provided mentoring and guidance. (AGH LR 56.1 Resp. ¶ 19.) When Zach learned that Freedman would be in his hometown in December 2017, Zach asked to meet, indicating that he was having personal problems, including with his father. (*Id.* ¶ 21.) During the meeting, according to Freedman, Zach described his frustration with his father, who had fired him from the Capital Companies, and expressed impatience to rejoin the Capital Companies in a larger role. (*Id.* ¶ 24.) When Freedman opined that Zach would probably not have the opportunity to rejoin the Capital Companies until his father decided to retire or sell the business, Zach became angry and emotional. (*Id.* ¶ 25.) In an effort to calm him, Freedman told Zach to continue to build his skills at AGH and, if the opportunity arose for Zach to rejoin the Capital Companies, Freedman would support him, including by investing in the companies. (*Id.*)

---

[1] Freedman purports to dispute that Riverside Chevrolet in Jacksonville, Florida, is the same "Riverside Chevrolet (Ferguson)" on the Covered Dealer list, but AGH explains that it is clear that they are indeed the same dealership because the former owner of Riverside Chevrolet in Jacksonville is named Ferguson. For simplicity's sake, the Court assumes that AGH is correct; as the Court will explain below, it makes no difference for purposes of the present motion.

Zach, however, reported to AGH that Freedman had told him that he planned to invest in Capital soon and he wanted Zach to come work for AIIS immediately, where he would be free from restrictive covenants with AGH. (Freedman LR 56.1 Resp. ¶¶ 68-69, 71.) Based on this information, AGH filed a motion to reinstate this litigation and for preliminary injunctive relief. On the eve of the preliminary injunction hearing, the parties reached an agreement. On October 12, 2018, the Court entered an agreed order, providing that (1) Freedman is permanently enjoined from violating paragraph 2 of the Settlement Agreement, (2) Freedman would not object to AGH's seeking a declaration that he has materially breached the Settlement Agreement, although Freedman denies committing any material breach, (3) there will be no further discovery other than discovery on damages, and (4) AGH would timely make the payment due under the Settlement Agreement on October 13, 2018. (Oct. 12, 2018 Order, ECF No. 256.)

AGH subsequently filed its Second Amended Counterclaim, seeking a declaration that (a) Freedman materially breached the Settlement Agreement by meeting with Hughes and allowing AIIS to do business with the Capital Companies, (b) based on Freedman's material breach, AGH is excused from its obligations, particularly its payment obligations, under the Settlement Agreement, and (c) AGH is the "prevailing party" in this litigation, and therefore it is entitled to reasonable attorney's fees and costs under the terms of the Settlement Agreement. (2d Am. Countercl. at 14, ECF No. 277.) AGH now moves for summary judgment on its counterclaim.

## ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See*

7

*Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The substance of the evidence must be admissible in a "form permitted by the Federal Rules of Evidence," although the "form produced at summary judgment need not be admissible" at trial. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).[2]

## I. MATERIAL BREACH

"A party that fails to perform its contractual duties is liable for breach of contract, and a material breach of the terms of the contract will serve to excuse the other party from its duty of counterperformance." *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700-01 (7th Cir. 2002). "The test of whether a breach is 'material' is whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement.'" *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014,

---

[2] Freedman raises objections on evidentiary grounds to various documents that AGH relies on, but these are largely the sort of objections to form that need not detain a district court at summary judgment because any improprieties can likely be cured by "replac[ing]" the offending evidence with "proper evidence at trial." *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742-43 (7th Cir. 1997). Regardless of the merits of Freedman's evidentiary objections, at summary judgment the Court is bound to view all the evidence in the light most favorable to Freedman, and viewing the evidence to which he objects in this harsh light, it tends to recede in importance anyway. Even ignoring all of his objections, this evidence does not tip the balance against him, so the Court need not rule on his objections at this stage.

1027 (Ill. App. Ct. 2012) (quoting *Vill. of Fox Lake v. Aetna Cas. & Sur. Co.,* 534 N.E.2d 133, 141 (Ill. App. Ct. 1989)). "The breach must be so material and important to justify the injured party in regarding the whole transaction as at an end." *Vill. of Fox Lake*, 534 N.E.2d at 141.

Determining whether a breach is material "'is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.'" *William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 779 (Ill. App. Ct. 2005) (quoting *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 706 F.2d 193, 196 (7th Cir. 1983)). "In Illinois, the Restatement of Contracts forms the basis for the state's contract law,"[3] *In re Krueger*, 192 F.3d 733, 741 (7th Cir. 1999), and numerous decisions formulate the relevant factors to consider according to section 241 of the Restatement (Second) of Contracts, which describes the following "circumstances" as "significant": "(1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Commonwealth Edison Co. v. Elston Ave.*

---

[3] The Settlement Agreement provides that Illinois law governs its interpretation, and neither party argues for applying any other state's law.

*Properties, LLC*, 76 N.E.3d 761, 767 (Ill. App. Ct. 2017) (citing *Rubloff CB Machesney, LLC v. World Novelties, Inc.*, 844 N.E.2d 462, 467 (Ill. App. Ct. 2006) and Restatement (Second) of Contracts § 241 (1981)). The inquiry is not "mechanical" but flexible, depending on the totality of the circumstances, and "case law makes clear that it is impossible to provide an exhaustive, dispositive checklist of factors for the trier of fact to consider in every situation." *Elda Arnhold*, 284 F.3d at 701 (citing *Sahadi*, 706 F.2d at 198).

AGH argues that Freedman materially breached the Settlement Agreement by exploring business opportunities with AGH employees and Capital Companies employees, both personally and through the insurance agency that he owned, AIIS, in violation of the Settlement Agreement's restrictive covenants. In particular, AGH cites Max Freedman's efforts through AIIS to partner with Capital Benefits Group on the TravaDoc product; Steve Freedman's contacts with Shepard and other Capital and AGH employees about investment opportunities; AIIS employee Healy's contacts and apparent collaboration with Capital Benefits Group employee Archer to sell garage insurance; and Freedman's December 2017 meeting with Zach Hughes. According to AGH, these contacts, at a minimum, violate the prohibition on "do[ing] business" with AGH agents and, in the case of the Zach Hughes meeting and Bob Feinen contacts, the prohibition on interfering with AGH employees. AGH argues that the Settlement Agreement explicitly states that AGH would not have entered into the agreement without the restrictive covenants, and "[i]n determining whether a breach is material, some Illinois courts have stated that the question is whether performance of the disputed provision was the '*sine qua non* of the agreement,' *i.e.*, 'of such a nature and such importance that the contract would not have been made without it.'" *Elda Arnhold*, 284 F.3d at 700 (quoting *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993)). Based on Freedman's material breaches, AGH argues, it should be excused from any

further performance of its obligations under the Settlement Agreement, including its obligation to pay the remaining $11 million due.

Freedman responds that determining whether a breach is material is an inherently fact-bound inquiry not well-suited for summary judgment, and a reasonable factfinder inclined to see things from Freedman's point of view could find that he did not commit a material breach. While it may be that the restrictive covenants were a critical component of the deal, Freedman argues, they did not represent the entirety of his side of the bargain; he also gave up his shares of stock in AGH, and AGH's remaining payment obligation is consideration for the redemption of his shares as well as the restrictive covenants. Indeed, according to Freedman, the agreement expressly contemplates breach of the restrictive covenants, without requiring termination of the parties' obligations in the event of such a breach. (AGH LR 56.1 Stmt. Ex. 16, Settlement Agreement, § 2(C)(c); *id.* Ex. 19, Subordinated Promissory Note, at 2.)

Regardless, Freedman argues, none of the contacts AGH has identified, even if any of them might have technically crossed a line set by the restrictive covenants, gives rise to a legal claim for breach of contract because there is no evidence that AGH has suffered any damages. None of these contacts resulted in any significant economic benefit to Freedman or AIIS or any detriment to AGH—nor will they, because the evidence shows that the Freedmans are winding down AIIS's business and instead investing in franchise restaurants and, in Max's case, a small franchise personal lines insurance agency. (AGH LR 56.1 Resp. ¶¶ 16-17.)

Even if AGH could establish damages, Freedman argues, the contacts that AGH claims to represent breaches of the Settlement Agreement are nothing of the sort. First, according to Freedman, he never had any serious discussion with Zach Hughes about leaving AGH to come work with him or anywhere else; he raised the possibility of working together in the future in a

hypothetical, speculative sense, purely for the purpose of easing Zach's agitation. Second, Max Freedman's contacts with Capital Benefits Group concerning the TravaDoc product did not violate the Settlement Agreement because Capital Benefits Group, unlike Capital Automotive, is not an AGH agent, and the fact that Capital Benefits Group and Capital Automotive are related entities, commonly owned by Rick Hughes and sharing support staff and management, does not undo their separate legal existence as business entities organized for different purposes: Capital Benefits Group sells personal and commercial lines insurance, whereas Capital Automotive markets vehicle service contracts. It is undisputed that the TravaDoc product is not a vehicle service contract, nor does the evidence show that it is commonly sold with vehicle service contracts in the F&I department of car dealerships. (AGH LR 56.1 Resp. ¶ 33.) Third, Del Healy's contacts with Dan Archer did not result in any quotes being prepared for any dealer covered by the Settlement Agreement or for any Capital Companies entity, so their collaboration did not amount to a breach. Finally, Freedman's contacts with Shepard or others about investment opportunities did not result in any investments in any entity that competes with AGH (indeed, Freedman specifically turned down Shepard because he did *not* want to violate his restrictive covenants), so these contacts also did not amount to a breach.[4]

---

[4] AGH argues that the Court should draw an adverse inference against Freedman with regard to his contacts with Shepard, Feinen, and Fischer because he was not forthcoming in producing records of his correspondence with them and may have deleted text messages or emails from or to them. The Court is not convinced. As Freedman explains, he had a regular practice of deleting text messages and emails promptly, which he ceased as soon as AGH reinstated this litigation in 2018. There is only one deleted communication, a January 29, 2018 text message between Freedman and Shepard, that postdates the reinstatement of this litigation, and in the absence of other evidence of bad faith, a single deleted text message is not sufficient to support drawing an adverse inference. *Cf. Weitzman v. Maywood, Melrose Park, Broadview Sch. Dist. 89*, No. 13 C 1228, 2014 WL 4269074, at *3 (N.D. Ill. Aug. 29, 2014) (drawing inference of bad faith because "multiple" important documents were destroyed, reasoning that "[e]ven if the failure to preserve [a single document] could be construed as something less than bad faith, the continued failure to preserve several [documents] cannot"). AGH argues that Freedman's duty to preserve communications predated the reinstatement of the litigation, but it cites no authority for this proposition. The Court is not inclined to draw any adverse inference at this stage.

The Court tends to agree with Freedman that, based on his side of the story, there is a genuine, material factual dispute as to whether Freedman, personally or through AIIS, violated the Settlement Agreement's restrictive covenants. The evidence does not point only in one direction on issues such as what really happened at the December 2017 meeting between Freedman and Zach Hughes or on the relationship between the various business entities making up the Capital Companies, including Capital Automotive and Capital Benefits Group, and a reasonable factfinder could find in favor of either side on those questions. On issues such as Shepard's offering Freedman an investment opportunity that he turned down, if the evidence is one-sided, it points rather in favor of Freedman. But for purposes of the material breach inquiry, the Court need not delve deeply into these details. Even if the factfinder were to find that Freedman technically breached the Settlement Agreement's restrictive covenants, it could still reasonably find that the breach was not material, viewing the remaining evidence in the light most favorable to Freedman.

AGH focuses on the centrality of the restrictive covenants to the settlement, repeatedly emphasizing the fact that it would not have entered into the Settlement Agreement without them. But establishing the importance, at the time of contracting, of the provisions that Freedman allegedly breached does not suffice to establish that, in the totality of the circumstances, a harmless, technical violation of those provisions is a material breach. AGH ignores that "[w]hether or not a breach is . . . material and important is a question of degree," to be "answered by weighing the consequences" of the breach in its full context. 10 Corbin on Contracts § 53.4 (2019); *see also C.G. Caster Co. v. Regan*, 410 N.E.2d 422, 426 (Ill. App. Ct. 1980) (quoting this language from Corbin). Further, in the context of determining whether a breach of contract is material, Illinois courts recognize the doctrine of *de minimis non curat lex*. *See People ex rel. Dep't of Pub. Health v. Wiley*, 843 N.E.2d 259, 270 (Ill. 2006) (citing *Pacini v. Regopoulos*, 665 N.E.2d 493, 497 (Ill.

App. Ct. 1996) (applying the doctrine to a shopping center sale contract where 95% occupancy was required and 94.9953% was achieved)).

AGH repeatedly cites a discussion in open court at an August 10, 2017 court hearing, when the parties reported on the status of their efforts to reduce their July 2017 settlement to a written agreement, in which Magistrate Judge Rowland made the following remarks about the purpose of the restrictive covenants, from her point of view, based on her recollection of the parties' settlement discussions:

> [W]hat [AGH] was worried about was that if somebody went in, if the Freedmans went in to sell [garage insurance] . . . let's say, . . . that then they could also say: Oh, by the way, we have these . . . F and I products. . . . [T]he Freedmans definitely agreed that . . . for significant [AGH] clients . . . [t]hat the Freedmans are completely hands-off those people. They can't sell them life insurance . . . . They can't sell them garage . . . insurance. They can't sell them any kind of insurance.

(AGH LR 56.1 Stmt. Ex. 18, Aug. 10, 2017 Tr. of Court Proceedings at 4:17-22, 5:24-6:5.) As AGH appears to admit by emphasizing these comments, the purpose of the restrictive covenants was to protect AGH's vehicle service contract ("F and I") business from encroachment by Freedman, Max and any business entity they owned or controlled. The prohibition on business contact between the Freedmans and AGH agents and employees, even contact that did not relate expressly to vehicle service contracts, was always about preventing the Freedmans from stealing vehicle service contract business.

Viewing the evidence in the light most favorable to Freedman, neither the Freedmans nor any of their employees ever made any attempt to sell vehicle service contracts to, through, or with any AGH agents or clients. If so, the Court fails to see how the actions of Freedman or any AIIS employees, even if technically in violation of the restrictive covenants, were "so substantial and fundamental as to defeat the objects of the parties in making the agreement," *InsureOne*, 976 N.E.2d at 1027. Further, because the Freedmans have not persisted in their contacts with AGH

14

agents and employees and have moved on to unrelated business pursuits, there is no reason to "regard[] the whole transaction as at an end," *Village of Fox Lake*, 534 N.E.2d at 141. The Freedmans have stayed out of the vehicle service contract business and now appear to have removed themselves even from the fringes of it, so their breach of the Settlement Agreement did not "defeat the bargained-for objective of the parties," *Elda Arnhold*, 284 F.3d at 701, and to whatever extent they were in breach, they have cured the breach. AGH has not been able to point to any concrete prejudice or harm that it suffered based on the Freedmans' actions, which suggests that any breaches they or their employees committed were *de minimis*. *See Pacini*, 665 N.E.2d at 497; *see also Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-CV-1122, 2015 WL 183912, at *15 (C.D. Ill. Jan. 13, 2015) ("[T]he Court finds a breach of this obligation [to inform the plaintiff of complaints made against her] is inconsequential because it did not result in an actual injury to Plaintiff. Illinois courts follow the doctrine of *de minimis non curat lex,* [which] operates to 'place outside the scope of legal relief the sorts of intangible injuries normally small and invariably difficult to measure.'") (quoting *Pacini*, 665 N.E. 2d at 497).

Further, to the extent the factfinder finds the Freedmans credible, it could reasonably find that they did not act with bad-faith intent to breach the contract or harm AGH's business interests. It could find, for example, that they genuinely believed that their contacts with Capital Benefits Group were not off-limits because Capital Benefits Group was not Capital Automotive, and that they did not encroach on AGH's core vehicle service contract business. Under such circumstances, the Freedmans' forfeiture of the remaining $11 million due under the Settlement Agreement would be vastly out of proportion with their wrongdoing and with the prejudice to AGH, which is minimal, if any.

15

In summary, applying the factors Illinois courts have identified to determine whether a breach is material, and viewing the evidence in the light most favorable to Freedman, the Court cannot say that Freedman materially breached the Settlement Agreement as a matter of law. It follows that the Court cannot hold that AGH should be excused from any further payment obligation as a matter of law. AGH's motion for summary judgment is denied as to that issue.[5]

## II. "PREVAILING PARTY" AND ATTORNEYS' FEES

AGH claims that it is entitled to the attorneys' fees it has incurred since the reinstatement of this litigation. The Settlement Agreement provides that the "substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of . . . any fees or expenses incurred . . . including . . . reasonable attorneys' fees." (AGH LR 56.1 Stmt. Ex. 16, Settlement Agreement § 16.) AGH claims that it is already the "substantially prevailing party" in this reinstated litigation based on Judge Rowland's October 12, 2018 agreed order, which "permanently enjoined" Freedman "from violating paragraph 2 of the Settlement Agreement." (Oct. 12, 2018 Order, ECF No. 256.) Because AGH obtained substantial relief in the October 12, 2018 order, AGH argues, it is the substantially prevailing party, at least through the date of that order.

The Court is not convinced. In the analogous context of federal fee-shifting statutes and rules, courts have recognized that a party need not have received all the relief it sought to be considered "prevailing"; for example, "[a] plaintiff who has settled a case is considered a prevailing party if she has achieved some success on the merits and can point to a resolution that has changed the legal relationship between herself and defendant." *Connolly v. Nat'l Sch. Bus*

---

[5] AGH also asks for summary judgment on Freedman's affirmative defenses, but for the same reasons summary judgment is inappropriate on AGH's counterclaim, it is inappropriate on Freedman's affirmative defenses to that counterclaim.

*Serv., Inc.*, 177 F.3d 593, 595 (7th Cir. 1999) (considering whether settling plaintiff was a "prevailing party" under Title VII); *see First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1014 (7th Cir. 1985) (analogizing to Federal Rule of Civil Procedure 54(d) in interpreting contractual "prevailing party" provision); *see also* 10 Moore's Federal Practice, § 54.101 (Matthew Bender 3d Ed. ("Thus, the Supreme Court has held [in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 604 (2001),] that to qualify as a "prevailing" party under a federal fee-shifting statute, a litigant must obtain a "judicially sanctioned change in the legal relationship of the parties," [and] [s]everal lower courts have directly applied this "prevailing party" analysis [in other contexts]."). However, a putatively "prevailing party" is not entitled to attorneys' fees if she obtains only "nominal" relief, which "reveal[s] [her] failure to prove an actual, compensable injury." *Gibbons v. Vill. of Sauk Vill.*, No. 15 CV 4950, 2018 WL 2388399, at *3 (N.D. Ill. May 25, 2018) (citing *Aponte v. City of Chi.*, 728 F.3d 724, 727 (7th Cir. 2013) ("[A] reasonable attorney's fee for a nominal victor is usually zero.")).

The relief AGH obtained in the October 12, 2018 Order is a permanent injunction prohibiting Freedman "from violating paragraph 2 of the Settlement Agreement," the paragraph containing the restrictive covenants. As the Court has explained above, there are genuine material factual disputes on the issue of whether Freedman ever breached paragraph 2 of the Settlement Agreement. If the factfinder finds that he never did, then the relief AGH obtained in the October 12, 2018 Order gave AGH nothing it did not already have. Such relief is merely nominal, and it does not entitle the party obtaining it to attorneys' fees as a "prevailing party."

Because there is a genuine material factual dispute on the issue of whether Freedman ever breached the Settlement Agreement, there is a genuine material factual dispute on the issue of

17

whether AGH qualifies as a "prevailing party" for obtaining an injunction to stop him from doing it.  AGH's motion for summary judgment is denied on this issue.

## **CONCLUSION**

For the reasons set forth above, the Court denies AGH's motion for summary judgment [287].  A status hearing is set for 9/19/19.

**SO ORDERED.**                                                           **ENTERED: August 22, 2019**

                                                                         _____
                                                                         **HON. JORGE ALONSO**
                                                                         **United States District Judge**