IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN E. FREEDMAN and KATE FREEDMAN, as Trustees of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005,<br>           Plaintiffs,<br>v.<br><br>AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation,<br><br><br>           Defendant. | Civil Action No. 1:16-cv-11039<br><br>Hon. Jorge L. Alonso |
| AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation, and AMERICAN GUARDIAN WARRANTY SERVICES, INC. an Illinois corporation<br><br>           Counterplaintiffs,<br>v.<br><br>STEVEN E. FREEDMAN, individually and as Trustee of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005,<br><br>           Counterdefendant. | |

**ORDER**

Plaintiff/counterdefendant Steven Freedman's motion in *limine* to bifurcate trial and bar evidence of damages [348] is granted as to bifurcating trial, but otherwise denied. The Court bifurcates the issue of whether defendants/counterplaintiffs American Guardian Holdings, Inc., and American Guardian Warranty Services, Inc., (collectively, "AGH") are entitled to declaratory relief from the issue of the amount of the prevailing party's reasonable attorneys' fees. The Court will hear and determine the latter issue not at the trial set for 10/19/20 but in subsequent proceedings. Freedman's motions to limit proceedings to material breach [351], to bar argument on discovery issues before Judge Rowland [352], and to bar parol evidence [353] are denied. Freedman's motion for status on trial [359] is denied as moot. Freedman's objections to AGH's trial exhibits are overruled to the extent that Freedman objects to AGH's introduction of statements in emails made by Freedman, Max Freedman, or employees of American Integrity Insurance Solutions, Inc., which are admissible against him under Federal Rule of Evidence 801(d)(2)(A)

and (D). The Court otherwise reserves ruling on Freedman's objections. Pretrial conference remains set for 9/11/20.

## STATEMENT

Before the Court are Freedman's four fully briefed motions in *limine* and his objections to AGH's trial exhibits, along with AGH's responses. The parties' submissions reveal dramatically different conceptions of the scope of the upcoming bench trial set for October 19, 2020. The Court's usual practice is to rule on motions in *limine* at the final pretrial conference (here, set for September 11, 2020), but given the parties' fundamental disagreements about the scope of the trial, the Court deviates from that practice in favor of this written ruling, in hopes that it will allow the parties to better prepare for the upcoming trial.

I. *Motion to bifurcate trial and preclude AGH from introducing evidence of damages and Motion to limit proceedings to material breach*

The Court takes Freedman's first two motions together, as both the motion to bifurcate and motion to limit proceedings to material breach turn on a determination of the proper scope of the proceedings in this case.

This case initially arose out of a dispute over a stock purchase transaction. The parties settled the dispute in October 2017. Their settlement agreement imposed certain restrictive covenants against Freedman. (Settlement Agr. ¶ 2, ECF No. 277-1.) In the settlement agreement, Freedman expressly acknowledged that "in the event of any actual or threatened breach . . . of any of the [restrictive covenants], [AGH] will have no adequate remedy at law . . . [and] shall be entitled to injunctive and other equitable relief without . . . the necessity of showing actual damages." (*Id.* ¶ 2(A)(vii).) Further, the agreement provided that "[t]he substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties in such action or proceeding, any fees or expenses incurred . . . (including . . . reasonable attorneys' fees and disbursements) in connection with any such action or proceeding." (*Id.* ¶ 16.) Shortly after entering into the settlement agreement, the parties stipulated to dismiss this case, without prejudice and with the Court to retain jurisdiction to enforce the settlement agreement for a period of four years.

In January 2018, AGH filed a motion seeking the following: to reinstate the action due to Freedman's apparent breach of the restrictive covenants, based on his solicitation of an AGH employee; for a preliminary injunction against Freedman; for referral of the preliminary injunction proceedings to then-Magistrate Judge Rowland, who had previously mediated the case; and to permit expedited discovery. This Court granted the motion as to reinstatement and referral, and it referred the remainder of the motion to Judge Rowland for further proceedings. Following discovery, the case was set for a preliminary injunction hearing before Judge Rowland, but the parties reached an agreement on the eve of the hearing. In accord with their agreement, Judge Rowland entered the following agreed order:

> Defendant American Guardian's Motion for Preliminary Injunctive Relief [Dkts. 158, 167], is granted, by agreement of the parties, as follows:

> 1. Steven E. Freedman, individually and as Trustee of the Steven and Kate Living Trust Dated April 20, 2005 (the "Freedman Parties"), is hereby permanently enjoined from committing any violation of [the restrictive covenants in] paragraph 2 of the Confidential Redemption, Settlement And Mutual General Release Agreement of October 2, 2017 between the parties (the "Settlement Agreement");
> 2. The Freedman Parties will not object to the filing of a pleading by American Guardian Holdings, Inc. and/or American Guardian Warranty Services, Inc. seeking a declaration from a court that the conduct that has been the subject of the preliminary injunction proceedings in this Court constitutes a material breach by Mr. Freedman of the Settlement Agreement, although Mr. Freedman denies the same and retains the right to defend against that pleading. Without regard to the declaratory judgment proceeding, this injunction order will remain in place;
> 3. Other than discovery on damages, there will be no further discovery by the parties regarding the alleged breach of contract by Mr. Freedman that has been alleged in the pending proceeding in any subsequent declaratory judgment proceeding;
> 4. American Guardian will timely make the payment due on October 13, 2018 under the terms of the Settlement Agreement.

(Judge Rowland's Oct. 12, 2018 Order (hereafter, "the Agreed Order"), ECF No. 256.) Soon after, pursuant to paragraph 2 of the Agreed Order, AGH filed a Second Amended Counterclaim (ECF No. 262, later refiled at ECF No. 277) in which it alleged that Freedman had materially breached the 2017 settlement agreement by violating the restrictive covenants. In its prayer for relief, AGH sought the following:

> AGH respectfully pray for judgment in their favor and against Freedman by granting the following relief:
> a. A declaration that Freedman actually and materially breached the Settlement Agreement;
> b. A declaration that AGH is excused from providing Freedman with financial statements and from future payment obligations to Freedman under the Settlement Agreement;
> c. A declaration that AGH is the substantially prevailing party in the reinstated litigation and entitled to its reasonable attorney's fees and costs in the reinstated litigation;
> d. All other relief the court deems just and proper.

(2d Am. Countercl. at 14, ECF No. 277.) AGH subsequently moved for summary judgment on the counterclaim, arguing that (a) Freedman materially breached the settlement agreement; (b) AGH is therefore excused from further obligations under the settlement agreement; and (c) AGH is entitled to its reasonable attorneys' fees in the reinstated litigation as the substantially prevailing party, at least through the date of the entry of the Agreed Order, regardless of whether it prevails on the material breach issue.

The Court found that there were genuine issues of material fact as to whether Freedman had actually or materially breached the settlement agreement in any more than a *de minimis* way. Further, based on those unresolved factual issues, the Court concluded that it could not determine at summary judgment whether the Agreed Order's injunction amounted to more than merely nominal relief, so could not determine whether AGH was a "substantially prevailing party" as to the Agreed Order. Using case law interpreting fee-shifting statutes for guidance, the Court explained that a party who obtains agreed relief can be considered "prevailing" if it "can point to a resolution that has changed the legal relationship" between the parties. (Aug. 22, 2019 Mem. Op. & Order at 16-17, ECF No. 338 (citing *Connolly v. Nat'l Sch. Bus. Serv., Inc.*, 177 F.3d 593, 595 (7th Cir. 1999).) The Court reasoned that if AGH can show that Freedman actually breached the settlement agreement (indeed, as the Court will discuss further below, it may be enough to show that a breach was "threatened" or imminent at or around the time of the reinstatement of this case), then the injunction AGH obtained in the Agreed Order might have worked a "judicially sanctioned change in the legal relationship" between the parties (Mem. Op. & Order at 17 (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598, 604 (2001)) that amounted to more than merely nominal relief. Because there were genuine and material factual disputes surrounding Freedman's alleged breach, the Court denied the motion for summary judgment, and has set a date for trial.

That brings us to Freedman's present motions in *limine*. In its responses, AGH disclaims any intent to seek a declaration that Freedman committed a material breach of the settlement agreement. Instead, AGH now seeks only to prove that Freedman committed an actual breach of the settlement agreement and that AGH is therefore the "prevailing party" in this litigation. AGH does not seek any damages for the breach other than its attorneys' fees for bringing these reinstated proceedings.

Freedman's position is that, if AGH is dropping the material breach issue, then there is nothing left to decide at trial. According to Freedman, the Agreed Order recognized that AGH would file a pleading seeking a declaration of material breach against Freedman, but it never mentioned attorneys' fees or prevailing parties. Freedman argues that if AGH intended to seek an award of attorneys' fees for the work its counsel performed during the proceedings on the motion for preliminary injunction, then it was required to seek them before those proceedings concluded with the entry of the Agreed Order, rather than in this new phase of litigation instituted by the Second Amended Counterclaim. Further, Freedman contends, AGH cannot prevail on any purported claim that Freedman committed some actual breach that, while falling short of a material breach, nevertheless entitles AGH to recover its attorneys' fees as damages. According to Freedman, the Second Amended Counterclaim asserts no such claim, focusing instead on material breach and whether to excuse AGH's remaining contractual obligations. Further, Freedman argues that any such claim would be outside the scope of the Agreed Order, and attorneys' fees are not proper contract damages.

The Court does not agree with Freedman's view of either the effect of the Agreed Order or the scope of the Second Amended Counterclaim. While the Agreed Order resolved the then-pending motion for preliminary injunction, it did not purport to be a final resolution on the merits of the issues arising out of Freedman's alleged breach of the settlement agreement. Far from *prohibiting* AGH from seeking further relief based on those issues, it expressly contemplated it by

4

providing that AGH would file a pleading seeking a further declaratory judgment against Freedman arising out of the facts it had obtained in discovery during the preliminary injunction proceedings. That pleading was the Second Amended Counterclaim, which expressly sought "[a] declaration that Freedman *actually* and materially breached the Settlement Agreement" (emphasis added) and "[a] declaration that AGH is the substantially prevailing party in the reinstated litigation and entitled to its reasonable attorney's fees and costs in the reinstated litigation." Freedman answered the counterclaim without specifically objecting to this relief as beyond the scope permitted by the Agreed Order. While it is true that the Second Amended Counterclaim focused largely on the issue of material breach, which AGH has abandoned, the relief that AGH seeks—a declaration of actual breach and that AGH was the prevailing party in the reinstated litigation—was in the Second Amended Counterclaim's prayer from the beginning. Further, the counterclaim alleges broadly the facts on which the request for that relief is based by recounting the history of the reinstatement of this case, beginning with the motion for preliminary injunction and the ensuing discovery, so the relief sought is not outside the scope of the factual allegations.

Freedman insists that the Agreed Order was meant to resolve the proceedings that preceded it, and the phrase "fees and costs in the reinstated litigation," as used in the Second Amended Counterclaim's prayer for relief, refers to the fees and costs for the proceedings that were to follow the filing of that pleading, not the proceedings that preceded it. Again, the Court does not agree. The plain meaning of the phrase "reinstated litigation" is broad enough to cover all of the litigation that followed this Court's reinstatement of this case in its January 25, 2018 minute entry (ECF No. 165), and the Court fails to see why it should limit the phrase to only those proceedings that followed the filing of the Second Amended Counterclaim. There is nothing strange in AGH seeking fees incurred in proceedings that have already taken place; in the analogous context of fee-shifting statutes, the Court frequently adjudicates petitions for reasonable attorneys' fees even after final judgment (and again, the Agreed Order was nothing of the sort). This is logical because, of course, it is not clear who the prevailing party is or how much effort is reasonably necessary to prevail until after the proceedings conclude. If Freedman's intent was for the parties to bear their own fees and costs for the proceedings that preceded the Agreed Order, he should have seen that the Agreed Order so provided; it would have been simple enough to add language to that effect.

As for Freedman's argument that attorneys' fees are not contract damages, while Freedman is correct that, as a general matter, a plaintiff asserting breach of contract cannot obtain as damages attorneys' fees incurred in the very action in which he seeks to enforce the contract, that is not the case where the contract specifically provides for attorneys' fees to the prevailing party in any such action. The Court recognized as much at summary judgment. (*See* Mem. Op. & Order at 17 (citing *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1014 (7th Cir. 1985).) The settlement agreement permitted AGH to bring an action for an injunction "in the event of any actual or threatened breach" without the "necessity of showing actual damages" (Settlement Agr. ¶ 2(A)(vii)), and, under paragraph sixteen of the settlement agreement, AGH is entitled to attempt to prove that it is the prevailing party because it obtained such an injunction.

In conclusion, AGH is entitled to seek a declaration that Freedman actually breached the settlement agreement and that it is entitled to its fees in the reinstated litigation as the substantially prevailing party, even though it no longer seeks a declaration of material breach. Freedman's motions in *limine* are denied to the extent that he seeks to bar evidence and argument to that effect.

5

However, the Court agrees with Freedman that it would be more efficient to bifurcate the issue of whether AGH is entitled to declaratory relief from the issue of the amount of the prevailing party's reasonable attorneys' fees. This is simply because, as the Court has already intimated, neither the Court nor the parties presently know who the "substantially prevailing party" is. If AGH carries its burden of proof at trial, it will be AGH; but if not, then it may be Freedman. It would be inefficient for both parties to present evidence of their reasonable attorneys' fees now, rather than wait until after the Court makes a determination as to AGH's requested declaratory relief. AGH argues in response that determining the amount of attorney's fees and litigation costs would "not involve much more than the submission of invoices" (ECF No. 355 at 4), but that ignores the likelihood that each side will probably object to some portion of the other side's attorneys' fees as unreasonable, and the Court is not interested in wasting time entertaining arguments about the reasonableness of fees from both sides if ultimately only one side or the other can obtain fees.

Thus, Freedman's motion [348] is granted as to bifurcation. At the upcoming trial, the Court will hear evidence bearing on whether to grant the declaratory relief AGH seeks; it will not hear evidence bearing on the amount of the parties' reasonable attorneys' fees. After ruling as to declaratory relief, the Court will set a schedule for the parties to brief the issue of the amount of the substantially prevailing party's reasonable fees and for further court dates as necessary.

## II. *Motion to exclude argument regarding discovery issues resolved by Judge Rowland*

AGH learned in discovery that Freedman deleted electronic communications between himself and employees of AGH and the Capital Companies that, AGH believes, would have shown that he violated the settlement agreement's restrictive covenants. Freedman contends that he deleted these communications pursuant to his normal practice of deleting messages after reading them, but AGH intends to ask the Court to draw an adverse inference against Freedman based on his destruction of or failure to preserve those communications.

Freedman moves to bar AGH from presenting evidence or argument to that effect, arguing that it would be improper to relitigate discovery issues after discovery has closed and, anyhow, the Court already refused to draw an adverse inference against Freedman at summary judgment.

Freedman seems to believe that if AGH were to seek an adverse inference of this sort, it was required to seek it as a discovery sanction before discovery closed, but the Court disagrees. AGH is entitled to describe to this Court what it uncovered in discovery, and at trial the Court, as the finder of fact, can draw whatever inferences it finds the facts to support. The fact that the parties argued over this issue in discovery does not prevent AGH from arguing that the facts it uncovered support an inference that Freedman was violating the settlement agreement's restrictive covenants.

While it is true that the Court refused to draw any such inference at summary judgment (*see* Mem. Op. & Order at 12 n.4), that is because, at that stage, it may not make findings of fact and it is required to view all facts in the light most favorable to the non-moving party (there, Freedman). At trial, it *will* be able to make findings of fact and draw inferences from the facts it finds. As the Court's discussion of the issue at summary judgment tends to show, the evidence in

6

favor of the inference AGH urges is, on balance, not overwhelming, but the Court will not bar AGH from seeking it.

**III.**     *Motion to bar parol evidence*

Freedman seeks to bar evidence of discussions that took place during the parties' settlement negotiations, arguing that such evidence is improper based on the settlement agreement's merger and integration clause. That clause provides that the settlement agreement "constitutes the entire agreement between the Parties" and "[a]ny and all prior agreements, correspondence, discussions, and undertakings of the Parties are merged herein and made a part hereof with the intention of the Parties that this Agreement shall serve as the complete and exclusive statement of the terms of their valid Agreement." (ECF No. 277-1 ¶ 11.)

AGH responds that statements made by Freedman's counsel and Judge Rowland during settlement negotiations show that the parties understood that business-related contact with Rick Hughes, Bob Shepard, and other Capital Companies personnel was off-limits, even if it was related to insurance products other than vehicle service contracts. According to AGH, the restrictive covenant language prohibiting Freedman and his employees from "[d]o[ing] business with" or "[s]olicit[ing]" "any person or entity that was a[n] [AGH] agent, marketing representative or Covered Dealer" (Settlement Agr. ¶ 2(A)(iv)), applies to Hughes, his companies, and their employees because Hughes's company, Capital Automotive, Inc., was an AGH agent. AGH argues that there is no other reasonable interpretation of the settlement agreement, but even if there is, it only shows that the language is ambiguous, which permits the introduction of its proffered parol evidence in order to interpret the contract.

Under Illinois law, when a contract contains an integration clause, the guiding principles for determining when to admit parol evidence of the contract's terms are as follows:

> In interpreting a contract, "a court initially looks to the language of a contract alone." *Air Safety, Inc. v. Teachers Realty Corp.,* 706 N.E.2d 882, 884 (Ill. 1999). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Id*. "If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present." *Id*.

*Motorola Sols., Inc. v. Zurich Ins. Co.*, 33 N.E.3d 917, 945 (Ill. App. Ct. 2015) (internal citations altered). "Only then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity." *Air Safety*, 706 N.E.2d at 884. Thus, the Court must first determine whether the relevant settlement agreement language is ambiguous on its face; only if so may AGH present parol evidence of the terms of the contract.

AGH proffers its parol evidence on the question of whether Hughes, Shepard, and other Capital Companies representatives qualify as AGH "agents," as the term is used in the settlement agreement. The Court finds no facial ambiguity in the contract's use of that term. The term "agent" in the phrase "person or entity that was a[n] [AGH] agent, marketing representative, or Covered Dealer" refers to a person or entity authorized to sell AGH's vehicle service contracts. *See* Black's

7

Law Dictionary (11th ed. 2019) (defining "Insurance Agent" as a "person authorized by an insurance company to sell its insurance policies"). The parties may differ as to whether Hughes, Shepard, or Capital Companies personnel with whom Freedman or his employees had business dealings were actually AGH agents, or whether they had a close enough relationship with Capital Automotive, Inc., to qualify as AGH agents themselves, but that does not mean that the contract language is ambiguous. "When judges say that a contract is 'clear on its face,' they mean simply that an ordinary reader of English, reading the contract, would think its application to the dispute at hand certain." *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir. 1995) (Posner, J.). The term "agent," as used in the context of the settlement agreement, was clear and unambiguous in that sense. Reading it in context, any reasonable person with even a passing familiarity with the industry (or indeed with how insurance is sold generally) would understand it. AGH may attempt to prove, if it can, that Hughes and the others were "agents" within the meaning of the term as it was used in the contract, but it may not resort to parol evidence to do it.

Nevertheless, the parol evidence AGH proffers is admissible, not as parol evidence of the terms of the contract but for a different reason altogether. It will shed light on the parties' states of mind during the events leading up to the reinstatement of the case and to the entry of the Agreed Order, and it will aid the Court in determining whether the Agreed Order afforded AGH the substantial relief based on the merits of AGH's claims, rather than for nuisance value, that might make AGH a "prevailing party" entitled to attorneys' fees.

In interpreting the "prevailing party" provision in the settlement agreement, the Court looks to the persuasive authority found in decisions interpreting the "prevailing party" provisions in federal fee-shifting statutes and in Federal Rule of Civil Procedure 54(d)(1). (*See* Mem. Op. & Order at 16-17.) The Supreme Court has explained that, under such provisions, a plaintiff prevails "'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Lefemine v. Wideman*, 568 U.S. 1, 4 (2012) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992)). The Seventh Circuit has described the sort of "actual relief" that meets this requirement as follows:

> The relief requirement emphasizes the practical impact of the lawsuit, and the Supreme Court has repeatedly held that the relief must be real in order to qualify for fees. *Farrar,* 506 U.S. at 110-12; *Buckhannon,* 532 U.S. at 641 n. 13 (Ginsburg, J., dissenting) and cases cited therein. For instance, in *Rhodes v. Stewart,* 488 U.S. 1, 4 (1988), the Court held that a plaintiff who obtains a declaratory judgment but obtains no real relief whatsoever is not a prevailing party. *See also Hewitt* [*v. Helms*, 482 U.S. 755, 761 (1987)] (judicial statement that plaintiff's rights were violated does not affect the relationship between the plaintiff and the defendant; to be a prevailing party, plaintiff must gain relief of substance). Furthermore, the Supreme Court has emphasized that the relief is actual when it changes the legal relationship between the parties. That is because
>> [i]n all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination

> of some conduct. Redress is sought *through* the court, but *from* the defendant.
>
> [emphasis in original] *Hewitt,* 482 U.S. at 761. The mere moral satisfaction of being wronged is insufficient to trigger prevailing party status. *Id.* at 762, *Cady v. City of Chicago,* 43 F.3d 326, 330 (7th Cir. 1994) (holding that unless plaintiff "can point to a direct benefit or redressed grievance other than the 'psychic satisfaction' of ending 'invidious discrimination,' he does not emerge as a prevailing party"); *see also Richardson v. Continental Grain Co.,* 336 F.3d 1103, 1106 (9th Cir. 2003) (although plaintiff succeeded on a legal issue, attorney's fees unavailable because no actual relief obtained, "only the possibility of future relief").

*Petersen v. Gibson*, 372 F.3d 862, 865 (7th Cir. 2004) (some internal citations altered).

Actual relief need not come in the form of a judgment following a trial to confer prevailing party status. An agreed resolution may suffice, so long as the agreed relief consists not merely of a defendant's "voluntary change in conduct" but also of a "judicial imprimatur on the change." *Buckhannon*, 532 U.S. at 605. For example, a settlement agreement enforced through a consent decree, even without an admission of liability by the defendant, creates the "'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* at 604 (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989)). Other settlement agreements, even if not labeled as consent decrees, might still confer "prevailing party" status, provided there is "some official judicial approval of the settlement and some level of continuing judicial oversight." *T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 479 (7th Cir. 2003) (citing *Buckhannon,* 532 U.S. at 604 n. 7 and *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002)). But where the defendant agrees to certain relief not "based on the merits of [the plaintiff's] claim," *Fisher v. Kelly*, 105 F.3d 350, 353 (7th Cir. 1997), but in order to "compromise for less than the costs of defense," *i.e.*, settles for "nuisance value," *Fletcher v. City of Fort Wayne, Ind.*, 162 F.3d 975, 976 (7th Cir. 1998), the agreement does not make the plaintiff a prevailing party. *See Texas State Teachers*, 489 U.S. at 792-93 ("Where the plaintiff's success on a legal claim can be characterized as purely technical or de minimis, a district court would be justified in concluding that [the plaintiff is not the prevailing party].") (citing, *inter alia*, *Chicano Police Officer's Assn. v. Stover,* 624 F.2d 127, 131 (10th Cir. 1980) ("Nuisance settlements, of course, should not give rise to a 'prevailing' plaintiff")).

The Agreed Order, which imposes a permanent injunction, might qualify as the sort of relief that is "sufficiently analogous to a consent decree," *T.D.*, 349 F.3d at 478, to confer prevailing party status. *See Lefemine*, 568 U.S. at 4-5 (plaintiff was prevailing party because he "brought . . . suit in part to secure an injunction to protect himself from the defendants' . . . threat of [wrongdoing, and] he succeeded in removing that threat" by securing a permanent injunction against the defendants). But its injunctive component was phrased in vague and conclusory terms, enjoining Freedman from "committing any violation of [the restrictive covenants in] paragraph 2 of" the settlement agreement, without spelling out what that meant, in terms of any particular conduct Freedman must avoid. True, in *Lefemine*, the injunction was phrased in similarly conclusory terms, but it was also accompanied by a "determin[ation] that the defendants had infringed Lefemine's rights." *Id.* at 1. Here, the Court did not make and has not yet made any such determination as to the merits of the case, *i.e.*, any determination whether Freedman actually

9

breached the restrictive covenants or threatened to do so. It is therefore unclear whether an injunction that simply forbids him from breaching the restrictive covenants "alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 4 (internal quotation marks omitted).

Further, the evidence is equivocal on whether the Agreed Order was a compromise based on the strength of plaintiff's position or on concerns about the costs of defense—and, in particular, about the uncertainty surrounding whether AGH would make the payment due to Freedman under the settlement agreement on October 13, 2018, and whether failing to do so would trigger a larger problem by putting AGH's "other financing at risk." (*See* Freedman's Mot. in *Limine* to Limit Proceeding to Material Breach at 3-4, ECF No. 351.) If, as Freedman contends, he had never committed any "actual or threatened breach" (Settlement Agr. ¶ 2(a)(vii)) of the restrictive covenants, then what he gave up in the Agreed Order (the injunction and the prospect of facing allegations of material breach) may have been of little value compared with the costs of continuing to litigate over the preliminary injunction, particularly to the extent that doing so might put his future payments from AGH in jeopardy, for reasons to do with AGH's financing and not necessarily the merits of the dispute over the restrictive covenants. *See Fisher*, 105 F.3d at 353.

To look at the issue another way, because the relief AGH obtained in the Agreed Order, though phrased as a permanent injunction barring Freedman from violating certain restrictive covenants, still left AGH the task of litigating the issue of whether any of Freedman's actual or threatened conduct amounted to a violation of those restrictive covenants, there is a sense in which it is analogous to a preliminary injunction. Such injunctions, to the extent they do not resolve contested issues on the merits, but instead are of a "tentative character, in view of the continuation of the litigation to definitively resolve the controversy," *Sole v. Wyner*, 551 U.S. 74, 78 (2007), do not permit a conclusion as to who the prevailing party is until after the conclusion of "further proceedings on the merits." *See Consol. Paving, Inc. v. Cty. of Peoria, Ill.*, No. 10-CV-1045, 2013 WL 916212, at *2-3 (C.D. Ill. Mar. 8, 2013) (citing *Dupuy v. Samuels*, 423 F.3d 714, 724 (7th Cir. 2005)). However, even a preliminary injunction that causes the defendant to change its behavior "based in part on a determination of likely success on the merits" may represent the sort of "judicially sanctioned change in the relationship" that qualifies the plaintiff as a prevailing party, even if the proceedings never reach a final judgment on the merits. *Consol. Paving*, 2013 WL 916212, at *4; *see id.* at *3-5 (citing, *inter alia*, *DuPuy*, 423 F.3d at 723-24).

Depending on what the evidence reveals, a significant issue at trial may be why Freedman consented to the injunction imposed by the Agreed Order. He may have done so because, although he had not committed or contemplated any breach, the injunction cost him nothing for that very reason (*i.e.*, it prohibited no actions that he had any intent to take), so continuing to fight it would have cost more than it was worth. But the evidence may suggest that he had reason to fear that AGH might be able to show that he had committed an "actual or threatened breach" (Settlement Agr. ¶ 2(A)(vii)) and he feared stricter, more costly relief. The parol evidence that AGH has proffered may shed light on what the parties understood to be the implications of the restrictive covenants, in terms of examples of particular activities that they prohibited, which may in turn shed light on their intentions and states of mind leading up to and after the reinstatement of these proceedings. In that regard, the evidence will be useful to the Court in determining whether the Agreed Order made either party the prevailing one—not because it bears on the terms of the

10

settlement agreement *per se*, but because it bears on the parties' intentions and their states of mind at key points in the proceedings. Put simply, it bears on the likelihood that the Agreed Order "modif[ied] the [counter]defendant's behavior in a way that directly benefits the [counter]plaintiff." *See Lefemine*, 568 U.S. at 4.

Therefore, the Court will not bar the evidence of Judge Rowland and Freedman's counsel's statements during settlement negotiations, although it will consider this evidence only for the limited purpose of ascertaining the parties' states of mind leading up to and after the reinstatement of this case, not as parol evidence for the purpose of ascertaining the terms of the settlement agreement.

**IV.** *Freedman's Objections to Trial Exhibits*

Freedman has objected to most of the trial exhibits AGH has proffered on grounds of relevance and hearsay. At present, without more information about how and in precisely what context AGH intends to use these exhibits at trial, the Court is unable to rule definitively on the admissibility of many of these exhibits. This is particularly true of the relevance objections—of which the Court is skeptical because, as AGH argues, potential prejudice is unlikely to outweigh probative value at a bench trial, given that there is little danger of the Court as factfinder using evidence for an improper purpose. As for the hearsay objections, to the extent that AGH responds that it does not offer the challenged evidence for the truth of the matter asserted, in many cases the Court will be in a better position to assess that position later, when it has more information about how AGH intends to use the evidence in question. However, the Court can dispose of certain arguments now to guide the parties in further preparations for trial.

Freedman objects on hearsay grounds to numerous exhibits containing email messages sent by Freedman or employees of American Integrity Insurance Solutions, Inc. ("AIIS"). AIIS is an insurance agency that was owned by Freedman and operated by his son Max, through which, AGH alleges, Freedman violated his restrictive covenants by doing business with the Capital Companies. According to AGH, AIIS emails are not hearsay under Federal Rule of Evidence 801(d)(2)(A) and (D) because they are offered against Freedman and they contain statements made by him or his agents or employees on matters within the scope of that relationship. To the extent they are hearsay, AGH argues, the emails meet certain hearsay exceptions.

The Court agrees with AGH that the statements in these emails written by Freedman, his son Max, or AIIS employees are non-hearsay admissions. To the extent the emails contain statements made by Freedman, they are plainly not hearsay under Rule 801(d)(2)(A). Regarding the emails containing statements made by Max or other AIIS employees, the Seventh Circuit has recognized the breadth of the hearsay exclusion expressed in Rule 801(d)(2)(D):

> Rule 801(d)(2)(D) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or [employee on] a matter within the scope of [that relationship and while it existed]." Fed. R. Evid. 801(d)(2)(D). There is no doubt that Rule 801(d)(2)(D) embodies a broader exception to the hearsay rule than many pre-Rule decisions had permitted. *See Nekolny v. Painter,* 653 F.2d 1164, 1171-72 (7th Cir.

11

> 1981) (citing Fed. R. Evid. 801(d)(2)(D) Advisory Committee Notes). The Rule simply requires that the statement be made by an individual who is an agent, that the statement be made during the period of the agency, and that the matter be within the subject matter of the agency. *See id.*

*Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 (7th Cir. 2003); *see Town of E. Troy v. Soo Line R. Co.*, 653 F.2d 1123, 1133 (7th Cir. 1980) (overheard statements of defendant's employees were "admissions of a party opponent under Rule 801"); *Brama v. Target Corp.*, No. 14 C 06098, 2017 WL 2404954, at *3 (N.D. Ill. June 2, 2017) (defendant's employee's statement was "'within the scope . . . of employment'" and therefore qualified as an admission because the employee was "'performing the duties of his employment when he [came] in contact with the particular facts at issue'") (quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F. 3d 756, 761 (7th Cir. 2003); *LaPorta v. City of Chi.*, 277 F. Supp. 3d 969, 989 (N.D. Ill. 2017) (citing *Nekolny*, 653 F.2d at 1171).[1] The statements in the emails that Freedman challenges generally appear to have been made by AIIS employees on matters within the scope of their employment, and to the extent that that is the case, they are admissible against Freedman as admissions of his employees.

But these exhibits consist of email conversations that also include messages sent by Hughes, Shepard, and certain Capital Companies employees, who are not Freedman's agents and whose statements are therefore not admissible against him under Rule 801(d)(2)(D). AGH suggests that these Capital Companies email messages are nevertheless admissible because they meet the hearsay exception in Rule 803(6) for business records. The Court is not convinced. An email message is not a business record "simply because it was sent between two employees in a company or because employees regularly conduct business through emails." *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019). To meet the hearsay exception set forth in Rule 803(6), a business record must be made as a "regular practice" and it must be "kept in the course of a regularly conducted activity" of the business. If it were enough to satisfy 803(6) to establish that "'a business keeps and receives emails,'" then "every single email sent within any company would fall within the exception." *Daneshvar*, 925 F.3d at 777 (quoting *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013)). That would "obviate the entire purpose of the business records exception, which is designed for a limited category of records—namely those that are regularly produced as a part of a company's business activities." *Daneshvar*, 925 F.3d at 777. When the email represents a "form of conversation" or a "one-time discussion," then it is not likely to satisfy Rule 803(6). *Id.*; *see United States v. DiCosola*, No. 12 CR 445, 2015 WL 2330233, at *4 (N.D. Ill. May 14, 2015), *aff'd*, 867 F.3d 793 (7th Cir. 2017) ("The Court excluded the emails because DiCosola offered them as business records when they clearly were not."). The emails in question are generally of that sort of "conversation" or "one-time discussion" that does not satisfy Rule 803(6). A few of them might be a product of the sort of "regularly conducted activity" that satisfies Rule 803(6), but that exception does not qualify the emails generally for blanket admission.

---

[1] The cases Freedman cites—*Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019) (finding "no evidence that [defendants] authorized [declarant] to speak on behalf of [defendants] on any subject . . . as contemplated by Rule 801(d)(2)(C)") and *Wells v. Obaisi*, No. 16-CV-08405, 2020 WL 1491182, at *4 (N.D. Ill. Mar. 27, 2020) (declarant's statements were "not statements of a party-opponent, as she [was] not a party to [the] suit, nor was she [the defendant's] agent or employee")—are distinguishable because they do not address a relationship based on a business ownership interest similar to the one between Freedman and AIIS under Rule 801(d)(2)(D).

12

It probably makes no difference, however, because the Capital Companies statements in these emails are admissible, if not for their truth, at least for the limited purpose of providing context for the admissions that Freedman and his employees made in these email conversations. When a party-opponent makes admissions in the midst of an "inherently interactive process" such as a back-and-forth conversation with non-parties, the non-parties' statements are admissible to provide the "full context" of the admissions, including "what questions or statements the [party or his agent] were responding to and the effect [they] had on . . . the listener." *United States v. Fernandez*, 914 F.3d 1105, 1111 (7th Cir. 2019) (citing cases); *see United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018) ("[W]hen the statement is offered to provide context for the words or actions of others rather than the statement's truth, it is admissible[, and] this exception is not limited to conversations between two parties so long as the out-of-court statements [by the non-parties] provide context."); *Empress Casino Joliet Corp. v. Johnston*, No. 09 C 3585, 2014 WL 6735529, at *3 (N.D. Ill. Nov. 28, 2014) ("conversations" were "not hearsay" because there was "sufficient evidence . . . that [the declarant] was acting as [the defendants'] agent during the conversations in question, making his statements admissible against defendants pursuant to Federal Rule of Evidence 801(d)(2)(D), and the statements of the conversations' other participants admissible to put [the agent's] statements in context"); *see also United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012) ("emails" were admissible because they were not offered for their truth but to "provide context" of transaction).

AGH also argues that these emails should be admitted under Rule 803(1), (3) or (5) to prove a relevant present sense impression, then-existing mental state, or recorded recollection, or under the residual exception in Rule 807. The Court is skeptical of these arguments as to the vast majority of the emails, but a final ruling on these issues is best reserved for a pretrial conference or trial, when the Court can make a fuller assessment of how the exhibits will be used and the purposes for which the statements are offered.

**SO ORDERED.**                                         **ENTERED:  August 27, 2020**

**JORGE L. ALONSO**
**United States District Judge**