**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN E. FREEDMAN and KATE FREEDMAN, as Trustees of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005, | ) ) ) ) | Civil Action No. 1:16-cv-11039 |
| Plaintiffs, | ) | |
| v. | ) ) | Hon. Jorge L. Alonso |
| AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation, | ) ) ) ) | |
| Defendant. | | |

_____

| | |
|---|---|
| AMERICAN GUARDIAN HOLDINGS, INC., an Illinois corporation, and AMERICAN GUARDIAN WARRANTY SERVICES, INC. an Illinois corporation | ) ) ) ) |
| Counterplaintiffs, | ) |
| v. | ) ) |
| STEVEN E. FREEDMAN, individually and as Trustee of the STEVEN AND KATE LIVING TRUST DATED APRIL 20, 2005, | ) ) ) |
| Counterdefendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Steven E. Freedman, along with his wife Kate, filed this suit on December 2, 2016, to resolve a dispute over a stock purchase transaction. The parties initially settled, stipulating to dismiss this case on October 13, 2017, with the Court retaining jurisdiction for a limited time to enforce the settlement agreement. However, on January 19, 2018, defendants American Guardian

Holdings, Inc., and American Guardian Warranty Services, Inc. (collectively, "AGH"), filed a motion to reinstate the case, asserting that Mr. Freedman had breached certain restrictive covenants in the settlement agreement. Following reinstatement of the case and discovery, AGH filed a Second Amended Counterclaim against Freedman, seeking a declaration that Freedman had actually and materially breached the settlement agreement and an award of attorneys' fees pursuant to a prevailing-party provision. AGH obtained a permanent injunction barring Freedman from violating the restrictive covenants, but the Court denied AGH's motion for summary judgment on the issue of material breach, an issue that AGH has now abandoned.

Over four days in October, November, and December 2020, during which the Court heard testimony from numerous witnesses and admitted exhibits into evidence, the Court conducted a bench trial on the issues of whether Freedman actually breached the settlement agreement and whether AGH was the prevailing party in the reinstated litigation. The parties submitted preliminary proposed findings of fact and conclusions of law prior to trial. Following trial, they submitted final versions of their proposed findings of fact and conclusions of law, responses to one another's proposed findings of facts and conclusions of law, and memoranda on evidentiary issues.

The Court makes the following evidentiary rulings, and it has considered all the evidence. On the basis of the following findings of fact and conclusions of law set forth pursuant to Federal Rule of Civil Procedure 52, the Court finds in favor of AGH and against Freedman, as outlined below, on the issue of actual breach. The Court declares that Freedman breached the settlement agreement by soliciting the employment of Zach Hughes. However, it finds and concludes that, because both parties prevailed on significant issues in the reinstated litigation, there is no

2

prevailing party entitled to attorneys' fees.

## EVIDENTIARY ISSUES

As a preliminary matter, the Court makes the following rulings on the parties' evidentiary objections.

### I. Freedman's Objections to Deposition Designations

### A. Zach Hughes

Freedman objects to AGH's designation of Zach Hughes's deposition testimony because, although AGH initially believed it could not produce him, Zach Hughes ultimately testified at trial. AGH responds that the Court already ruled this deposition testimony admissible in its December 15, 2020 post-trial order. That is incorrect. The Court stated that it would "entertain" designations because the parties had not had a full opportunity to make arguments about the issue in open court. (*See* Dec. 15, 2020 Order at 3 n. 2, ECF No. 397.) AGH was aware of this issue, and the time to make the argument was in the post-trial filings. But AGH has not provided any basis for admitting Zach Hughes's deposition testimony, when the same witness also testified at trial.[1] AGH also argues that, if its designations of portions of Zach's[2] deposition testimony must be excluded, Freedman's designations of Zach's deposition testimony must be excluded as well. Fair enough.

---

[1] Notably, Freedman does not make the same arguments about other witnesses. Jon Anderson testified live, and yet both parties designate portions of his deposition. Rogers Freedlund testified live, yet AGH designated portions of his deposition, and Freedman does not object. Based on the parties' agreement and in recognition of the importance of saving trial time during the exceptional circumstances of the COVID-19 pandemic, *see Hub v. Sun Valley Co.*, 682 F.2d 776, 777-78 (9th Cir. 1982) ("Depositions can save the time, effort and money of litigants, and help expedite trials."), the Court will not exclude the designated portions of Freedlund and Anderson's deposition testimony. The Court instead admits them under Federal Rule of Civil Procedure 32(a)(4)(E) and Federal Rule of Evidence 611(a).

[2] For short, the Court will refer to Zach Hughes by his first name to avoid confusing him with his father, Rick, who is also a witness in this case. It will do likewise with Freedman's son Max.

3

The Court relies only on Zach's trial testimony, and it excludes the deposition designations.

### B. Matt Weil Statements About Zach Hughes

Freedman objects to certain statements that AGH designated in the deposition of its inside counsel Matt Weil, who was asked what Zach Hughes told him about his December 2017 meeting with Freedman. Freedman contends that these statements are hearsay. AGH does not object to the exclusion of these statements, on which it does not rely in its post-trial submissions. Therefore, the Court will not rely on them either. The Court considers the designation abandoned.

### C. Lack of Personal Knowledge

Freedman objects to fifteen of AGH's designations as testimony made without personal knowledge. (*See* Freedman Evidentiary Objections at 4-5, ECF No. 402.) AGH only relies on seven of these in its post-trial filings, so the Court considers the other eight designations abandoned.

Regarding the seven designations that AGH defends, Freedman's objections go to weight rather than admissibility. In some of these designations, Max Freedman answers questions based on his own understanding of events he was participating in, and particularly what he believed his role was in them, and his answers are admissible as to his own understanding. They may lack much probative value as such, and therefore be entitled to little weight, to the extent that Max's understanding was limited or of limited relevance, but that does not make the answers inadmissible. This is particularly true because this is a bench trial, and the Court will not be confused and will not give the answer undue weight.

In some portions of these designated passages, Max and Weil give answers that amount to "I don't know." The Court does not agree with Freedman that an answer of "I don't know" makes

the answer inadmissible for lack of personal knowledge. Lack of personal knowledge presents a problem when a witness purports to answer a question, but it appears from the purported answer that the witness is testifying not based on his own knowledge, but instead based on speculation, hearsay, etc. There is no such problem, and no possibility that the finder of fact will place undue weight on any testimony of questionable reliability, when the witness explicitly disclaims knowledge of the subject. Additionally, there is no danger of prejudice at a bench trial because, to the extent that certain answers in these designations reveal that the witness's knowledge of the subject was limited, the Court will adjust the weight his answers receive accordingly.

In two other designations, Bob Shepard, sitting for a deposition as the representative of Capital Automotive, Inc., pursuant to Federal Rule of Civil Procedure 30(b)(6), is asked about whether non-competition covenants "make sense" from Capital's point of view and whether it would be typical to put company logos at the top of a document. Freedman suggests that Shepard is merely speculating, but Shepard is competent to testify as to Capital's practices in such matters. While the answer has little probative value, the Court sees no reason to exclude it. This is a bench trial, and the Court will not use the evidence for any improper purpose. Freedman's objections are overruled as to these seven designations.

### D. Misleading Use of the Term "Capital"

Freedman argues that, during several depositions, AGH improperly and misleadingly used the term "Capital" to refer to all the Capital Companies as one, without attending to the distinctions between Capital Automotive, Inc., and the various Capital business entities. According to Freedman, this misleading use of the term "Capital" in AGH's questioning corrupted the answers. The Court might be more receptive to this argument if there were a jury that might be confused,

5

but at this bench trial, the Court will not be. After presiding over this case for several years, the Court is well aware of Freedman's position as to the different Capital entities. Freedman will not be prejudiced because the Court will be able to give the answers the appropriate weight in light of the question asked, and it will not be confused about the differences between the different business entities. Freedman's objection is overruled.

### E. Questions Calling for Speculation

Freedman argues that AGH has designated ten passages in Max Freedman and Bob Shepard's depositions in which AGH's questions improperly called for speculation in violation of Federal Rule of Evidence 611. AGH does not rely on five of these designations in its post-trial filings, so the Court considers those five designations abandoned.

In one of the remaining designations, Max Freedman is asked if he remembers meeting Joe Jacoby, and he responds that he does not recall. But the Court explained above that "I don't know" is an acceptable answer, and "I don't recall" is no different. Testimony is not inadmissible because it turns out that the witness was asked a question he does not know the answer to. And, to whatever extent a question is improper because it calls for speculation, there is no harm done if the witness refuses to speculate, instead answering that he does not know. This objection is overruled.

The other designations are from Bob Shepard's deposition as Capital's Rule 30(b)(6) witness. One of them is a passage described above, in which Shepard is asked if a non-compete provision "makes sense." Again, the Court considers Shepard competent to answer this question from the standpoint of Capital's typical practices. The answer has little probative value in this case, but the Court will take it for what little it might be worth. The objection is overruled.

Another designation is a passage in which Shepard is asked what personnel Freedman was

referring to in an email, on which Shepard was copied, when he used the term "Team Capital." Shepard can testify to his understanding of the email, based on his knowledge of the context of the conversation as a participant and on his knowledge of Capital's operations, and the Court will give the answer the limited weight that it deserves, given Shepard's limited understanding. The objection is overruled.

Next, AGH designates a passage in which Shepard is asked about whether an email from Del Healy, copying Dan Archer, confirms whether American Integrity Insurance Solutions ("AIIS") and Capital are doing business with the Kevin Powell dealerships. Here, the Court agrees with Freedman that Shepard's answer is speculation, to the extent he purports to testify to what the email suggests about what non-Capital personnel might be doing. It is apparent that Shepard's testimony is merely his own personal interpretation of the email, not based on his knowledge of Capital's operations or typical practices. In fact, Shepard admits that he is only making an "assumption, which [is], of course, dangerous." (Capital 30(b)(6) Dep. at 179:12-13.) Freedman's objection is sustained as to the designation of Capital's Rule 30(b)(6) deposition at 178:27-180:03.

Finally, AGH designates a passage in which Shepard is asked if Freedman or anyone from AIIS communicated with Capital about Travadoc after November 16, 2017, and Shepard responds that he thinks there must have been some communication, given how unsuccessful the product was. This answer amounts to little more than "I don't know," so it is of little probative value, but Shepard is competent to give the answer to the extent it is based on his knowledge of Capital's operations as its Rule 30(b)(6) representative, so the Court will consider it for what it is worth. The objection is overruled.

### F.  Improper Lay Opinion Testimony

Freedman argues that AGH has designated certain improper lay opinion testimony from Shepard's deposition as Capital's Rule 30(b)(6) representative. The Court finds that this testimony about Shepard's point of view on noncompetition clauses and his familiarity with a document is admissible to the extent it is based on his knowledge of Capital's practices and operations as its Rule 30(b)(6) representative, and the Court will consider it for what it is worth, although it may be entitled to little weight. The objections to these designations are overruled.

## II.    Freedman's Objections to Exhibits

First, Freedman objects to documents about AIIS dating back to its formation in 2014 and throughout the following years. According to Freedman, these exhibits should be excluded because evidence of AIIS's business activity prior to 2017 is irrelevant. The Court disagrees. These exhibits are relevant background, and they are admissible, though their probative value is limited.

Next, Freedman objects to the admission of emails that AGH proffers as Capital business records under the hearsay exception in Federal Rule of Evidence 803(6). AGH relies on three such emails in particular, DTX 85, 100, and 105. The Court has already explained in a pre-trial ruling (*see* Aug. 27, 2020 Order at 12, ECF No. 385) that emails are not business records under Rule 803(6) merely because "employees regularly conduct business through emails." *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019). When emails represent a "form of conversation," the content of the emails does not fall within the hearsay exception of Rule 803(6). *Id.* These emails are all of the sort that represent a "form of conversation," so the statements in them are not excepted from hearsay under Rule 803(6). The fact that Rick Hughes authenticated them does not mean otherwise; authentication is a separate issue with a separate basis and function in the Federal Rules of Evidence. Rick Hughes's authentication of the emails means that they are what they purport to

8

be; it does not bear on the truth or reliability of the statements in them.

As the Court explained in its pre-trial ruling, to the extent that these emails contain admissions of a party-opponent (*i.e.*, admissions of Freedman or employees of AIIS, Freedman's business entity), those admissions are not hearsay, and other statements in the emails are admissible to give the admissions context. (*See* Aug. 27, 2020 Order at 11-12, 13 (citing *United States v. Fernandez*, 914 F.3d 1105, 1111 (7th Cir. 2019) (citing cases); *United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018); *Empress Casino Joliet Corp. v. Johnston*, No. 09 C 3585, 2014 WL 6735529, at *3 (N.D. Ill. Nov. 28, 2014); *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012).) The same goes for certain other email exhibits AGH submits, including DTX 27, 36, and 37.

Finally, Freedman objects to DTX 83, the certificate of authenticity of Capital's document production, signed by Rick Hughes. Freedman argues that this document is inadmissible hearsay. The Court is not persuaded. Federal Rule of Evidence 902(11) provides that documents meeting the requirements of Rule 803(6), "as shown by a certification of the custodian," are self-authenticating. Thus, as AGH points out, Rule 902(11) explicitly contemplates "'allowing a written foundation in lieu of an oral one,'" 5 *Weinstein's Federal Evidence* § 902.13 (2021) (quoting *United States v. Adefehinti*, 510 F.3d 319, 325 (D.C. Cir. 2007)), when a business turns over its records for use in a lawsuit. The rule would make little sense if the opposing party could simply object to the written certification as hearsay. Freedman states that "nearly" all of the records to which this certificate refers are emails (Freedman Evidentiary Objections at 12), and the Court has ruled that Capital's emails generally do not meet the requirements of Rule 803(6), so it may be a moot point. But "nearly" all is not all, and to the extent there are other records that do meet

9

the requirements of Rule 803(6) that DTX 83 authenticates, the certificate is not inadmissible on grounds of hearsay. As to this document, Freedman's objection is overruled.

## III. AGH's Objections to Deposition Designations

### A. Hearsay

AGH argues that Freedman has designated certain hearsay statements of AGH executive Jon Anderson, Matt Weil, and Bob Shepard. For the most part, the Court sees no hearsay problem with these statements. The statements by Anderson and Weil are admissions of a party-opponent, to the extent they are statements of AGH employees offered against AGH. (*See* Aug. 27, 2020 Order at 11-12 (citing cases).) In the statements of Bob Shepard on pages 25 and 26 of the 30(b)(6) deposition, the Court fails to see the out-of-court statement that might be hearsay.

But the Court agrees with AGH that Freedman designated certain hearsay statements in Bob Shepard's personal deposition. On pages 22-24 of his personal deposition, Shepard's testimony is hearsay, to the extent that he appears to repeat what he has heard Freedman say to Zach or heard what Zach or Rick Hughes have said about the same subject. The Court excludes the portion of Shepard's testimony containing those statements, from "You need . . ." on page 22, line 4, to the end of line 17 on the same page. Additionally, Freedman has designated testimony on pages 16 and 17 in which Shepard describes what Rick Hughes told him about Freedman and Zach's December 2017 breakfast meeting. This is classic hearsay. The Court excludes Shepard's testimony from page 16, line 24, to page 17, line 24.

### B. Foundation

AGH objects to several of Freedman's deposition designations for lack of foundation, arguing that the witnesses lack personal knowledge. For the most part, the Court agrees with

Freedman that there is no evidentiary problem with these designations, and the objections go to weight rather than admissibility. Again, the objection to many of these designations seems to be that the witness's answer turned out to be something akin to "I don't know," but, as the Court has explained, a question is not improper and an answer is not inadmissible for that reason alone. The only instance in these designations in which the Court agrees with AGH that the witness purported to answer a question he was not competent to answer is in Jon Anderson's testimony on pages 48 and 49 of his deposition, when he purported to testify as to whether Freedman had committed any other breaches of the settlement agreement, apart from the December 2017 meeting between Freedman and Zach Hughes. The question called for a legal conclusion, and even to the extent that it was a factual question, it is not clear that the answer was based on Mr. Anderson's personal knowledge, rather than what he had been told. Therefore, the Court excludes that portion of Mr. Anderson's designated testimony.

AGH also objects to Bob Shepard's testimony on page 21 of his deposition in his personal capacity, in which he speculates about how he might have known if Freedman wanted to invest in Capital but had not spoken to Rick Hughes about it. Freedman agrees that the testimony is speculative, so the objection is sustained.

### C. Improper Lay Opinion Testimony and Settlement Discussions

AGH objects to the designated testimony of Jon Anderson and Matt Weil regarding their understanding, as representatives of AGH, of what Freedman's obligations under the settlement agreement were. Freedman responds that, based on this Court's ruling in its August 27, 2020 Order, that evidence is relevant and admissible because it may be relevant to the prevailing party determination. (*See* Aug. 27, 2020 Order at 8-11.) In the final analysis, given the way the evidence

11

came in at trial, the understanding of these two individuals on these points is of little probative value. As the Court will explain in more detail below, the Court finds that Freedman breached the settlement agreement in at least one clear, concrete way prior to the time of the Agreed Order, so the Court need not rely on subjective beliefs, intentions, or states of mind to determine whether the Agreed Order likely modified Freedman's conduct in a way that meaningfully benefited AGH. (*Cf. id.*) Still, this evidence is at least minimally relevant, and there is no danger of prejudice, so the Court overrules AGH's objection.

## FINDINGS OF FACT

To the extent (if any) that the Court's findings of fact as stated may be deemed conclusions of law, they shall also be considered conclusions of law. In the same way, to the extent that the Court's conclusions of law may be deemed findings of fact, they shall also be so considered. In particular, "[t]o the extent that any factual findings are made in the Conclusions of Law section, that was done to better organize the Opinion for comprehensibility." *Vargas v. United States*, 430 F. Supp. 3d 500, 502-03 (N.D. Ill. 2019).

### I.   Factual Background

AGH sells vehicle service contracts, including extended warranty contracts, along with other finance and insurance products through agents and vehicle dealerships. In 2011, one of AGH's owners, Rogers Freedlund, needed an investor to buy out a business partner who was seeking a sale of the company. In July 2011, plaintiff Steven E. Freedman ("Freedman") purchased a stake in AGH for $4,500,000. At that time, Freedman owned and worked at RV America Marketing ("RV America"), a recreational vehicle insurance brokerage firm. He invested in AGH through that company, taking a 47.5% ownership share. Freedman later sold RV America, but he

caused RV America to transfer its shares of AGH to a trust that he and his wife controlled, the Steven and Kate Living Trust Dated April 20, 2005 ("the Freedman Trust"). The Freedman Trust later sold some of its shares to AGH so they could be transferred to certain AGH executives, but the trust remained a 37.25% shareholder.

In the years that followed Freedman's investment in the company, Freedman and Freedlund discussed the possibility of starting an insurance agency subsidiary that would leverage AGH's dealer network to sell commercial and personal lines insurance. However, the project never got beyond the exploratory stage, and nothing ever came of the idea. In 2014, Freedman started his own insurance agency, American Integrity Insurance Solutions ("AIIS"). Freedman remained the owner and financial backer of the agency, but over time, his son Max became an AIIS employee and became involved in operating the firm.

In 2016, potential buyers approached AGH, but no transaction ever materialized, and Freedman came to believe that Freedlund was not interested in selling (and indeed Freedlund never did sell AGH). Because Freedman was not interested in owning and operating AGH as a long-term proposition, he suggested that AGH buy back the shares owned by the Freedman trust. Freedlund agreed that the suggestion made sense. On November 17, 2016, Freedman, Freedlund, and other AGH officers and shareholders met to discuss buying Freedman out.

During the meeting, the parties reached agreement on at least some terms of the deal. Freedman and Freedlund both signed a document bearing the heading, "Freedman Buyout," which set forth the essential financial terms. Based on an overall valuation of AGH at $98,000,000, Freedman was to be paid $37,605,000 over three years, in four installments. He was to receive $20,000,000 on December 31, 2016; $5,868,333 on December 31, 2017; $5,868,333 on December

31, 2018; and $5,868,334 on December 31, 2019.

Following the November 17, 2016 meeting, AGH's lawyers attempted to put together a written document reflecting the parties' agreement and incorporating certain other non-price terms such as restrictive covenants. According to AGH, the parties' discussions on November 17, 2016, had contemplated the inclusion of restrictive covenants in the final terms of the deal. Freedman, however, interpreted the proposed written agreements proffered by AGH's lawyers as a post-hoc effort to alter the terms of the transaction.

## II. Freedman Files This Suit and the Parties Reach a Settlement Agreement

On December 2, 2016, Freedman filed this lawsuit, seeking specific performance of what he alleged was the completed agreement he and AGH had made at the November 17, 2016 meeting. AGH counterclaimed, asserting that Freedman had breached duties and obligations owed to AGH by surreptitiously competing against the company and diverting business opportunities, including by setting up AIIS, the existence of which AGH only discovered in 2016.

Following settlement proceedings before then-Magistrate Judge Rowland on July 26, 2017, the parties reached a settlement agreement, which they executed on October 2, 2017. The agreement required AGH to pay Freedman $15 million and Max $1.5 million on October 13, 2017, and to provide Freedman with two notes, one for $12 million, payable in three installments of $4 million due on October 13, 2018, October 13, 2019, and October 13, 2020, and another for $3 million due on October 13, 2021. The agreement contains certain restrictive covenants, including non-competition, non-solicitation, and non-interference provisions. The restrictive covenant provisions read as follows:

> (iii) Covenant Not To Compete. In furtherance of this Agreement, . . . the Freedmans covenant and agree that, during the Restricted Period [of three years for

14

Max and four for Freedman], they will not, either individually or together, nor will they permit any of their employees or affiliated companies, to, directly or indirectly, individually or as an investor, lender, owner, security-holder, partner, member, director, manager, officer, employee, consultant, representative, or agent of any other person or entity: (a) engage in the [vehicle service contract] Business in the Territory [of the United States]; (b) invest in any entity that is engaged in the Business in the Territory or that is or may reasonably be considered to be competitive with the Business or any portion thereof in the Territory; (c) provide services, or receive any compensation, consideration, discount, revenue or other compensation or economic benefit, in connection with the efforts of any person or entity to engage in the Business in the Territory or any business that may reasonably be considered to be competitive with the Business, or any portion thereof, in the Territory.

(iv) Non-Solicitation. Without limiting the generality of the provisions of Section 2(A)(iii) above, the Freedmans hereby covenant and agree that during the Restricted Period they will not, nor will they permit any of their employees or affiliated companies to, directly or indirectly: (a) Do business with any person or entity that was a Company Group agent, marketing representative or Covered Dealer within the one-year period beginning on October 14, 2016 and ending on the Initial Payment Date, or from any successor in interest to any such person or entity; or (b) Solicit any person or entity that was a Company Group agent, marketing representative or Covered Dealer within the one-year period beginning on October 14, 2016 and ending on the Initial Payment Date, or from any successor in interest to any such person or entity, for the purpose of securing any business.

(v) Interference with Relationships. During the Restricted Period, the Freedmans shall not directly or indirectly (including through an entity they own or for which they work) employ, engage, recruit, solicit, contact or approach for employment or engagement, any person or entity that, on or within the one (1) year period immediately preceding the Initial Payment Date, served as (A) a vendor that is material to the conduct of the Company Group's business, or (B) an employee or independent contractor of the Company Group, or otherwise seek or attempt to influence or alter any such person's or entity's relationship with the Company Group.

(DTX 11, § 2(A).) Max is bound by similar covenants. (*Id.* § 2(B)(i-iii)). The settlement agreement also provides that "[t]he Freedmans acknowledge . . . that . . . in the event of any actual or threatened breach by the Freedmans of any of the [restrictive covenants] contained in [section 2 of the settlement agreement], [AGH] will have no adequate remedy at law . . . [and] shall be

15

entitled to injunctive and other equitable relief without . . . the necessity of showing actual damages." (*Id.* § 2(A)(vii).) Further, the agreement provides that "[t]he substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties in such action or proceeding, any fees or expenses incurred . . . (including . . . reasonable attorneys' fees and disbursements) in connection with any such action or proceeding." (*Id.* § 16.) The parties stipulated to dismiss the case pursuant to their settlement agreement on October 13, 2017. (ECF No. 153.) This Court entered an "Order of Dismissal Without Prejudice" and closed the case on October 16, 2017. (ECF No. 154.)

## III. **Freedman Meets with Zach Hughes**

In December 2017, Zach Hughes, an AGH employee, reported to AGH executives that Freedman had offered him a job. Zach testified at trial that Freedman had met with him on December 16, 2017, and told him that he was considering an investment in the Capital Companies ("Capital"), a group of closely held companies owned by Rick Hughes, Zach's father. One of the Capital Companies, Capital Automotive, Inc. ("Capital Automotive"), is an AGH agent, meaning that it sells vehicle service contracts to automobile dealers on behalf of AGH. Zach Hughes and Freedman had met years earlier, around the time that Freedman made his investment in AGH. At that time, Zach was working for Capital. He and Freedman developed a personal friendship over the years, and Freedman served as a sort of mentor to Zach. They maintained their friendship after Zach left Capital in 2016 and began working for AGH.

On December 16, 2017, Zach and Freedman met for breakfast at the Ballantyne Resort in Charlotte, North Carolina, to discuss problems Zach had been having with his father. At trial, the parties offered different accounts of what transpired at this meeting. Zach testified that Freedman

16

brought up the possibility of Zach and Max working together. Freedman told Zach that Zach could come "work for Max" at a new company because he could be "hidden under there"—that is, he could perform work that might violate his restrictive covenants with AGH, but no one would notice because, as Zach recalls Freedman putting it, "we can hide you under a different company." (Trial Tr. at 549:3-10.) Zach testified that, on several past occasions, Freedman had made similar suggestions regarding the possibility of Zach and Max working together. Zach had once even received a set of AIIS business cards with his name on them. During the December 2017 breakfast meeting, Zach told Freedman that he felt—and he had felt for years, when Freedman had made similar suggestions in the past about Zach working with Max—that Max had not learned the business from the ground up, and Zach was not interested in working with him. Freedman mentioned the possibility of buying into Capital, and Zach became "upset," believing perhaps his father had gone "behind [Zach's] back." (Trial Tr. at 548:17.) The meeting ended shortly afterward. Zach understood that Freedman was partially trying to help him out with his "frustrations with [his] dad," but he also believed that Freedman was acting in his own self-interest by asking him to "leave employment with American Guardian and start up a business to be profitable." (Trial Tr. at 550:20-22.) Zach understood Freedman's proposal to be that they "start the plan to make it happen," and Freedman "went at [him] a couple times," as opposed to asking once and desisting after being rebuffed. (Trial Tr. at 552:12-13.) Immediately afterward, Zach called his father Rick to determine whether he was considering selling Freedman a stake in Capital, but Rick assured Zach that he had no plans to do so. Having observed Zach's demeanor during this in-person testimony, the Court finds his account of the conversation credible.

Freedman testified that, to the extent he suggested that he might invest in Capital, he was

speaking hypothetically. He intended only to demonstrate that he would support Zach if his problems with his father continued, including by making an investment, if necessary; he had not intended to indicate any present intent or desire to take any particular action. Further, Freedman testified was that he did not ask Zach to leave AGH's employment. On the intent to invest in Capital, the Court finds Freedman credible. No other evidence suggests that Freedman was actively taking steps to invest in Capital, and even Zach suggests that he came to believe shortly after their conversation that it was not true. On the issue of whether Freedman made overtures of employment, the Court finds Zach's testimony more credible than Freedman's, particularly given Freedman's years-long effort to hire Zach so that he and Max could "cross-pollinate with their [differing] skill sets," as Freedman put it at trial. (Trial Tr. at 309:19-20.)

Zach testified that he did not want to become involved in "drama" (Trial Tr. at 552:1), but after he confided in a colleague about the conversation with Freedman, he came to believe that, having done so, the word would get out. He decided that he should report the conversation with Freedman to AGH before AGH learned of it from someone else. At the AGH Christmas party some days afterward, Zach reported the conversation to Jon Anderson, his "boss" and an AGH executive. (Trial Tr. at 587:5-10.) AGH began to investigate the incident, and Zach spoke with AGH's legal counsel. On January 12, 2018, Zach swore an affidavit describing, in brief, what had happened at the December 16, 2017 meeting.[3]

## IV.  AGH's Reinstatement of This Case and Revelations in Discovery

On January 19, 2018, based on Zach Hughes's report of his December 16, 2017 meeting

---

[3] On February 19, 2018, Zach swore another affidavit, reaffirming the statements in the January 12 affidavit.

with Freedman, AGH filed a motion to reinstate this case, for a preliminary injunction, and to permit expedited discovery. (Mot., ECF No. 158.) In support of the motion, AGH asserted that Freedman had breached the settlement agreement's restrictive covenants by soliciting Zach, an AGH employee, to work for him. (*Id.* at 4-5; *see* Sealed Mot. at 4-5, ECF No. 167.) Further, AGH asserted that expedited discovery was appropriate because Freedman had demonstrated his "indifference to the terms of the Settlement Agreement," and therefore, according to AGH, it was "likely that Freedman ha[d] committed other breaches of the covenants in the Settlement Agreement," but AGH could not determine whether any other breaches had occurred without discovery. (Mot. at 6.) The Court reinstated the case and referred the motion to Judge Rowland for further proceedings.

In discovery, AGH sought information about Freedman and AIIS's business activities. AGH uncovered certain contacts between, on the one hand, Freedman and AIIS employees, and, on the other hand, Capital employees, AGH employees, and AGH customers, which AGH considers to have violated the settlement agreement.

First, AGH learned that AIIS was in discussions with Dan Archer of Capital Benefits Group, Inc. ("Capital Benefits Group"), and an entity known as Route 66 about offering a new product called "TravaDoc." Capital Benefits Group is an "agency representing life, health, and property-casualty products to corporations" (Capital Automotive Rule 30(b)(6) Dep. at 43:6-7) and one of the Capital Companies. Route 66 is an association of recreational vehicle dealerships that operates as a buying cooperative. TravaDoc was a subscription service that provided telephone access to a physician. In August 2017, Max Freedman was discussing attending a Route 66 event with Rick Hughes and Bob Shepard, a Capital executive. In October 2017, two days after signing the

19

settlement agreement, Max attended a trade show with Rick Hughes and Dan Archer to promote TravaDoc. Shepard later sent Max two draft agreements between AIIS and certain Capital companies to govern their arrangement. One was a Referral Agreement between Capital Benefits Group and AIIS, which provided that AIIS would earn referral fees for sales of TravaDoc. The other was an Agency Agreement between AIIS and Capital Processing, Inc., which authorized AIIS to represent certain products to potential clients and which specifically listed a series of finance and insurance products, in the same or a similar category to AGH's vehicle service contracts. Both parties executed the Referral Agreement. Neither Max nor anyone else on behalf of AIIS executed the Agency Agreement. Ultimately, the TravaDoc product was not a success. If Capital made any TravaDoc sales, they amounted to very little; Rick Hughes thought it might be less than $100. Correspondingly, if AIIS earned any referral fees, it was a minimal amount.

Second, AGH learned that an AIIS employee, Del Healy, who sold garage liability and garagekeepers workers' compensation insurance products to car dealerships, was corresponding with Shepard and Archer in late 2017 and early 2018 about certain "Covered Dealers." These are dealers who fall within the scope of the settlement agreement's restrictive covenants because they are identified in the settlement agreement as AGH customers. In particular, Healy and Archer corresponded via email about insurance for the Kevin Powell dealerships and Folger Automotive/Williams Buick GMC. Additionally, Healy submitted an expense report for taking the chief financial officer of Riverside Chevrolet in Jacksonville, Florida, out to lunch in December 2017, reporting that the purpose of the expense was to "review the insurance and discuss control procedures." The evidence does not show that Healy or anyone else at AIIS ever actually obtained or prepared quotes for the Kevin Powell or Folger/Williams dealerships, nor is there evidence that

20

AIIS ever actually requested or provided quotes for Riverside Chevrolet. AIIS terminated Healy in January 2018, due to Max's desire to take the business in another direction and his suspicion that Healy was soliciting business that was outside the scope of the work he was supposed to be doing for AIIS.

In December 2017, Shepard contacted Freedman to ask if he was interested in making a $500,000 loan to a company, referred to as "1803/Redemption," that was seeking funding for the purchase of finance contracts. Shepard and Freedman had known each other for years through the insurance industry, dating back to well before their respective involvements with Capital and AGH. Freedman initially responded that he was interested, but in a subsequent email he declined the opportunity. He testified at trial that his counsel had advised him that the investment might violate the settlement agreement's restrictive covenants.

AGH also discovered certain communications between Freedman and one of its sales executives, Bob Feinen. Like Shepard, Feinen was also a long-term friend of Freedman. In a January 18, 2018 email, Feinen asked Freedman if their communications were being monitored, and Freedman responded, "Nothing is monitored. They are lots of noise." (Trial Tr. at 278:10-11.) When asked at trial what he had meant by that, Freedman answered that Freedlund was "putting [him] through an awful lot of aggravation." (Trial Tr. at 278:14-15.) But when AGH pointed out in a follow-up question that this litigation had not yet been reinstated by January 18, 2018—AGH filed its motion to reinstate the following day—and asked again what he had meant, Mr. Freedman responded only, "I probably spoke out of school. I don't have an answer for you." (Trial Tr. at 279:10-13.)

In discovery, AGH uncovered evidence of other communications between Freedman and

Feinen, as well as undisclosed communications between Freedman and other individuals connected with this case, including Zach Hughes and Bob Shepard. Freedman had a regular practice of deleting electronic communications as soon as the specific subject matter of the communications had been resolved or concluded, so he was unable to produce these communications.

Following discovery, Judge Rowland set a hearing on AGH's motion for preliminary injunctive relief for October 16, 2018. On the eve of the preliminary injunction hearing, the parties reached an agreement. On October 12, 2018, Judge Rowland entered the following agreed order:

> Defendant American Guardian's Motion for Preliminary Injunctive Relief [Dkts. 158, 167], is granted, by agreement of the parties, as follows:
>
> 1. Steven E. Freedman, individually and as Trustee of the Steven and Kate Living Trust Dated April 20, 2005 (the "Freedman Parties"), is hereby permanently enjoined from committing any violation of paragraph 2 of the Confidential Redemption, Settlement And Mutual General Release Agreement of October 2, 2017 between the parties (the "Settlement Agreement");
>
> 2. The Freedman Parties will not object to the filing of a pleading by American Guardian Holdings, Inc. and/or American Guardian Warranty Services, Inc. seeking a declaration from a court that the conduct that has been the subject of the preliminary injunction proceedings in this Court constitutes a material breach by Mr. Freedman of the Settlement Agreement, although Mr. Freedman denies the same and retains the right to defend against that pleading. Without regard to the declaratory judgment proceeding, this injunction order will remain in place;
>
> 3. Other than discovery on damages, there will be no further discovery by the parties regarding the alleged breach of contract by Mr. Freedman that has been alleged in the pending proceeding in any subsequent declaratory judgment proceeding;
>
> 4. American Guardian will timely make the payment due on October 13, 2018 under the terms of the Settlement Agreement.

(Oct. 12, 2018 Order, ECF No. 256 ("the Agreed Order").) As contemplated in paragraph 2 of the Agreed Order, AGH subsequently filed a Second Amended Counterclaim in which it sought a

declaration that "Freedman actually and materially breached the Settlement Agreement" and that "AGH is the substantially prevailing party in the reinstated litigation and entitled to its reasonable attorney's fees and costs in the reinstated litigation," under section 16 of the settlement agreement. (2d Am. Countercl. at 14, ECF No. 277.)

On February 1, 2019, AGH filed a motion for summary judgment on the Second Amended Counterclaim, arguing that Freedman materially breached the settlement agreement, so AGH should be excused from future payment obligations and was entitled to attorneys' fees as the prevailing party. This Court denied the motion, finding genuine issues of fact as to whether Freedman breached the settlement agreement and, correspondingly, as to whether AGH was entitled to fees as the prevailing party. Prior to trial, AGH dropped its material breach argument. It now seeks a declaration that Freedman actually breached the settlement agreement and that AGH is the substantially prevailing party in the reinstated litigation.

## CONCLUSIONS OF LAW AND APPLICATION OF LAW TO FACTS

The Court has jurisdiction over this contract dispute, which is governed by Illinois law, pursuant to 28 U.S.C. § 1332(a). Freedman and his wife Kate are residents and citizens of Puerto Rico. American Guardian Holdings, Inc., and American Guardian Warranty Services, Inc., are Illinois corporations, with their principal place of business in Warrenville, Illinois, so they are citizens of Illinois. The amount in controversy is greater than $75,000.

"A disagreement about whether parties to a settlement have honored their commitments is a contract dispute," which "arise[s] under state law." *Jones v. Ass'n of Flight Attendants-CWA*, 778 F.3d 571, 573 (7th Cir. 2015) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). Here, the settlement agreement provides that Illinois law governs its

23

interpretation, and both parties cite Illinois law.

Under Illinois law, "[t]he essential elements of a breach of contract claim are (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff." *Wolff v. Bethany N. Suburban Grp.*, 2021 IL App (1st) 191858, ¶ 62. "The Declaratory Judgment Act, 28 U.S.C. § 2201, allows federal courts, in their discretion, to render declaratory judgments . . . where there exists an actual controversy." *Bell v. Taylor*, 827 F.3d 699, 711 (7th Cir. 2016) (internal quotation marks omitted).

The Court first addresses AGH's claim that Freedman actually breached the settlement agreement. It will then turn to whether AGH is entitled to attorney's fees as the substantially prevailing party.

## I. Actual Breach

AGH asserts that Freedman, either individually or through his business entity AIIS, breached the settlement agreement by (a) soliciting Zach Hughes, and (b) doing business with Capital, Route 66, and Covered Dealers.

### A. Solicitation of Zach Hughes

Section 2(A)(v) of the settlement agreement provides that, during a "Restricted Period" of several years (four for Freedman, three for Max) after the settlement agreement's "Initial Payment Date" (*i.e.*, October 13, 2017), Freedman and Max were not to "directly or indirectly (including through an entity they own or for which they work) employ, engage, recruit, solicit, contact, or approach for employment or engagement, any person or entity that, on or within the one (1) year period immediately preceding the Initial Payment Date, served as . . . an employee . . . of [AGH], or otherwise seek or attempt to influence or alter any such person's or entity's relationship with

24

[AGH]." (DTX 11). The Court concludes that Freedman breached this provision by soliciting or approaching Zach Hughes for employment.

As the Court explained above, Freedman and Zach offer different accounts of their meeting on December 16, 2017. Having observed the demeanor of the witnesses and considered their accounts in light of all the facts and circumstances, the Court finds Zach's more credible. In particular, the Court finds Zach's account credible in light of Freedman's history of trying to convince Zach to come work with Max. Additionally, shedding light on Freedman's state of mind leading up to the reinstatement of these proceedings is his unguarded remark in his January 18, 2018, email to Feinen that "nothing is monitored" and AGH is nothing but "lots of noise" in that regard, a remark that he could not explain when asked at trial. It is apparent that he was overly cavalier about the obligations imposed on him by the restrictive covenants, and therefore the Court finds Zach Hughes more credible than Freedman with respect to the December 16, 2017 meeting. In soliciting Zach's employment with AIIS or another Freedman-owned entity, Freedman breached section 2(A)(v) of the settlement agreement.

### B. Doing Business and/or Solicitation of Capital, Route 66, and Covered Dealers

AGH argues that Freedman violated the settlement agreement, individually or through AIIS, by (1) discussing and evaluating an investment opportunity with Bob Shepard of Capital, (2) partnering with Capital to promote the TravaDoc product to Route 66 dealer customers, and (3) doing business with Covered Dealers through Del Healy, in partnership with Dan Archer.

### 1. Investing with Shepard

According to AGH, Freedman violated the settlement agreement by considering the 1803/Redemption investment opportunity brought to him by Shepard. The Court finds no violation

25

of the settlement agreement here. AGH's position appears to be that, by corresponding with Shepard about this business opportunity, Freedman was "[d]o[ing] business" with an AGH "agent, marketing representative or Covered Dealer," in violation of section 2(A)(iv) of the settlement agreement. It is true that Shepard was a high-level Capital employee, and one of the Capital Companies, Capital Automotive, Inc., was an AGH agent. However, it appears that Shepard was proposing this transaction in a personal capacity, from one insurance-industry professional to another, not as a representative of Capital Automotive, Inc. Further, Freedman declined the transaction. Thus, this is not an instance in which Freedman "d[id] business" with Capital Automotive, Inc., or indeed anyone else. There is no breach of contract here.

### 2. TravaDoc

AGH contends that Freedman violated the settlement agreement via Max's efforts, while working for AIIS, a company Freedman owned, to promote the TravaDoc product. Here, unlike in the 1803/Redemption deal, a transaction was consummated: Max executed the Referral Agreement with Capital Benefits Group on behalf of AIIS. The Court tends to agree with AGH that, although the "business" proved to be minimal in terms of sales, entering into the Referral Agreement with the expressed intent to profit by it qualifies as "[d]o[ing] business," for purposes of section 2(A)(iv) of the settlement agreement.

However, Freedman argues that AIIS was not "doing business" with an AGH "agent" because the Referral Agreement was with Capital Benefits Group, and Capital Benefits Group, unlike Capital Automotive, was not an AGH agent. AGH argues, in response, that the Capital Companies were commonly owned by Rick Hughes and they made little distinction between their separate entities. For example, Capital employees had "capitalcompanies.com" email addresses,

26

rather than addresses individualized by company, and some employees, including Bob Shepard, performed work for all or several of them.

As the counter-plaintiff, AGH has the burden of proof, and it has not carried it on this issue. Freedman argues, without any pertinent response from AGH, that the fact that the Capital Companies are commonly owned does not mean that they are interchangeable. *See generally Gen. Cas. Co. of Wisconsin v. Techloss Consulting & Restoration*, 461 F. Supp. 3d 804, 812 (N.D. Ill. 2020) (citing authorities to establish that one business entity is generally not "responsible for [another's] obligations, even if they were part of the same corporate family"); *see also GAVCO, Inc. v. Chem-Trend Inc.*, 81 F. Supp. 2d 633, 643-44 (W.D.N.C. 1999) (citing similar authorities under the law of North Carolina, the state of incorporation of the Capital Companies). AGH argues in its response brief that Freedman's cases are not on point to the extent they are about piercing the corporate veil—but that is what makes them broadly relevant. While they may not be perfectly analogous, they stand for the general point that corporations are ordinarily treated as legally distinct entities responsible only for their own legal obligations, unless there is a showing that they are a mere tool or "instrumentality" of another, *see Glenn v. Wagner*, 329 S.E.2d 326, 329-31 (N.C. 1985), and AGH does not engage with that point. AGH needed to establish in some sense that the TravaDoc transaction was really between AIIS and Capital Automotive, the AGH agent. But it has not established that Capital Automotive so dominated Capital Benefits Group as to violate the "instrumentality" rule, nor has it established that these entities were so insubstantial as to have no valid "mind, will or existence" of their own, separate from their owners'. *See id.*

Max signed a Referral Agreement with Capital Benefits Group, which Shepard identified as an "agency representing life, health, and property-casualty products to corporations, . . . [m]ost

27

of which are benefit programs." (Capital 30(b)(6) Dep. at 43:4-9.) Thus, Capital Benefits Group appears to have been in a different line of business than Capital Automotive. (*Compare id. with id.* at 38:22-39:10 ("Capital Automotive is a consulting firm for automobile dealers. We recruit, train, create the pay plan and the business plan for an employee at the dealerships that the industry refers to as a finance and insurance manager. . . . So we take turnkey responsibility for the staffing and the profitability and the efficiency and integration of the F&I department into the other . . . operations under the roof of a car dealership.").) Although Max had contact on the TravaDoc matter with Capital representatives, such as Rick Hughes and Shepard, who operated at a high enough level to be considered representatives of all Capital Companies, it appears that one of his principal contacts and a driving force on the TravaDoc project was Dan Archer, the only employee of Capital Benefits Group, who focused on health-benefits products. There is no evidence that Dan Archer was involved in Capital Automotive's business or that the TravaDoc product was set to be incorporated into Capital Automotive's business of "tak[ing] turnkey responsibility for . . . F&I department[s]" at car dealerships. (*Id.* at 39:6-8). While there may appear to be a superficial similarity between the TravaDoc product and AGH's vehicle service contracts, to the extent that both might be sold in F&I departments at vehicle dealerships, the evidence does not reveal any genuine areas in which these products overlapped within the operations of the Capital Companies: TravaDoc was sold (if at all) at RV dealerships through Capital Benefits Group, and AGH's vehicle service contracts were sold at car dealerships through Capital Automotive.

The Court agrees with Freedman that if the parties wanted the settlement agreement to cover this situation, they could have included language about "affiliates" or terms of that nature in the settlement agreement—but they did not. Capital Automotive, not Capital Benefits Group, was the

AGH agent, the entities were in separate lines of business, and AGH has not demonstrated that Capital Automotive's fingerprints are on this transaction. AGH has not proven that Freedman breached the settlement agreement by way of the TravaDoc project.

AGH also argues that the TravaDoc project violated the settlement agreement because receiving an "economic benefit" from Route 66 violated the non-compete provision in section 2(A)(iii). The Court is not convinced. As Freedman argues, Route 66 is not a company that sells vehicle service contracts in the way that AGH does, so the non-compete provision does not apply to Route 66. Further, AGH has not proven that AIIS received any "economic benefit" from Route 66, as necessary to violate § 2(A)(iii))(c) of the settlement agreement. There is no conclusive evidence of what sort of payments AIIS received and in what amounts—and in any case, whatever the amount was, it was apparently a *de minimis* amount. There is no breach of contract here either.

### 3. Covered Dealers

AGH argues that Freedman breached the settlement agreement via Del Healy's contacts with the Covered Dealers, and with Capital employees about the Covered Dealers. Regarding the latter argument, to the extent that the Capital employee with whom Healy was corresponding was Dan Archer, the Court has already explained that AGH has not proved that corresponding with Dan Archer of Capital Benefits Group amounted to doing business with Capital Automotive. Further, nothing in the correspondence provides sufficient proof of any conduct that rises to the level of solicitation or doing business with Capital (even assuming for a moment that soliciting or doing business with any Capital entity or employee, rather than Capital Automotive, were enough) to amount to a violation of the settlement agreement. Without stronger evidence of the consummation of a business transaction or even any clear, genuine proposal of one, these

communications do not qualify as "doing business" or solicitation.

As for whether Healy solicited business from Covered Dealers, the Court recognizes that some of the evidence of Healy's contacts with Covered Dealers may have been slightly troubling from AGH's perspective. But again, AGH has not adduced evidence sufficient to prove that Healy and AIIS's conduct rose to the level of solicitation or doing business in violation of the settlement agreement. What the evidence before the Court shows is that Healy exchanged information about Covered Dealers via email and submitted an expense report in which he reported taking a Covered Dealer out to lunch to "review the insurance and discuss control procedures." That is not enough, on its face, to amount to solicitation of or doing business with a Covered Dealer, nor does it support an inference that AIIS engaged in prohibited conduct. The lunch could as easily have been a friendly attempt to keep in touch with a business contact. Any inference of wrongdoing would require an element of speculation that the law does not permit. *See Bafia v. N. Indiana Pub. Serv. Co.*, 993 F.2d 1306, 1309 (7th Cir. 1993) ("Reasonable inferences from the evidence are permissible, but inferences must be reasonably supported by the evidence and cannot be mere speculation or surmise.") (internal citation omitted). AGH has not met its burden of proving that Freedman or any of his AIIS agents breached the settlement agreement in business dealings with Capital, Route 66, or Covered Dealers.

### 4. Adverse Inference

AGH argues that, to the extent the evidence it has adduced does not itself establish an actual breach of the settlement agreement, the Court should draw an adverse inference against Freedman based on his destruction of certain electronic communications, such as text messages and emails. Freedman admits that he did delete electronic communications that AGH later sought in discovery,

30

but he deleted the vast majority of these documents prior to the reinstatement of the case, and only pursuant to his regular practice of deleting such communications periodically, after the pertinent conversation appeared to have reached a conclusion. He denies deleting anything to hide it from AGH or anyone else.

The fact that relevant communications were destroyed is not enough to permit an inference that they contained information adverse to Freedman; the Court must find that Freedman "intentionally destroyed the documents in bad faith." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). "Thus, the crucial element is not that evidence was destroyed but rather the reason for the destruction." *Id.* (internal quotation marks omitted). "A document is destroyed in bad faith if it is destroyed 'for the purpose of hiding adverse information.'" *Id.* (quoting *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001)).

AGH has not proved that Freedman acted in bad faith, *i.e.*, for the purpose of hiding adverse information. First, as a general matter, the disputes over the scope and breadth of discovery that AGH has described in support of its position (*see* AGH Proposed Findings of Fact and Conclusions of Law ¶¶ 122-138, ECF No. 403) do not strike the Court as suspicious. It is relatively routine in commercial litigation of this nature for a counterdefendant to conceive of discovery on the counterclaim more narrowly than the counterplaintiff does. Further, Freedman asserts that once AGH reinstated this litigation and he began to work with his counsel again, he ceased his normal practice of deleting communications periodically and cooperated with counsel to preserve records that he might have to turn over in discovery. AGH has not demonstrated that Freedman is lying by, for example, adducing evidence that Freedman "selectively deleted communications only from individuals involved in this case, or contacted the recipients of his communications to have them

delete such emails and texts." (Freedman Resp. to AGH Proposed Conclusions of Law at 36-37, ECF No. 406.)

Additionally, the Court is not convinced by AGH's argument that Freedman was on notice that he was required to preserve all communications that might conceivably relate to this case, even after it was dismissed in October 2017, merely because the case had been dismissed without prejudice, leaving the potential for reinstatement. Unlike the potential for appeal by a disappointed litigant, as in the case AGH cites, *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1134-35 (7th Cir. 1987), the potential that the parties would so quickly reinstate a case that they had settled with considerable effort and expense likely seemed remote to Freedman. The Court is not convinced that he had a duty, prior to the reinstatement of this case, to preserve documents such as the deleted communications here at issue. Further, AGH has not demonstrated that it was harmed by Freedman's destruction of electronic communications; in fact, it has been broadly able to obtain from third parties communications it was not able to obtain from Freedman.

The standard set by the Seventh Circuit for drawing an adverse inference is high. *Bracey v. Grondin*, 712 F.3d 1012, 1019–20 (7th Cir. 2013) (noting that the Seventh Circuit, unlike other circuits, requires intentional destruction of relevant documents for the purpose of hiding adverse information). The showing AGH has made does not meet that high standard. On balance, the evidence does not support an inference that Freedman deleted the communications in bad faith, and therefore the Court declines to infer that the content of these communications would have been adverse to Freedman's interests in this case.

## II. Prevailing Party and Attorneys' Fees

Illinois follows the "American rule," which provides that a prevailing party can only recover

its attorneys' fees from its opponent if "an express statutory or contractual provision" allows for it. *Oak Forest Properties, LLC v. RER Fin., Inc.*, 116 N.E.3d 341, 344 (Ill. App. Ct. 2018). The settlement agreement provides that "[t]he substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties in such action or proceeding, any fees or expenses incurred . . . (including . . . reasonable attorneys' fees and disbursements) in connection with any such action or proceeding." (DTX 11 § 16.) Because "contracts that provide for an award of attorney fees to the prevailing party are in derogation of common law," they must be "strictly construed." *Oak Forest*, 116 N.E.3d at 344.

"A party can be considered a 'prevailing party' for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit, receives a judgment in his favor or by obtaining an affirmative recovery." *Grossinger Motorcorp, Inc. v. Am. Nat. Bank & Tr. Co.*, 607 N.E.2d 1337, 1348 (Ill. App. Ct. 1992) (internal citations omitted). Under this rule, a party may be entitled to fees as the prevailing party even if he did not succeed on every issue or claim he raised or did not obtain the maximum relief he sought. *See Timan v. Ourada*, 972 N.E.2d 744, 753 (Ill. App. Ct. 2012); *J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship*, 757 N.E.2d 1271, 1277 (Ill. App. Ct. 2001); *Tomlinson v. Dartmoor Const. Corp.*, 645 N.E.2d 376, 383 (Ill. App. Ct. 1994); *see also Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 835 (7th Cir. 2020) (applying Illinois law).

But a trial court may also determine, in such mixed result cases, that neither party prevailed, *see, e.g.*, *Raffel v. Medallion Kitchens of Minnesota, Inc.*, 139 F.3d 1142, 1143 (7th Cir. 1998), or that "both parties [are] successful on significant issues in the action," *Med+Plus Neck & Back*

33

*Pain Ctr., S.C. v. Noffsinger*, 726 N.E.2d 687, 694 (Ill. App. Ct. 2000), such that the outcome is essentially a stalemate, or a "draw." *Oak Forest*, 116 N.E.3d at 345 (citing *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 242 (Ill. App. Ct. 2001), and *Raffel*, 139 F.3d at 1143). In such cases, "it may be inappropriate to find that either party is the prevailing party and an award of attorney fees to either is inappropriate." *See Powers*, 761 N.E.2d at 240. Trial courts must engage in a "comparative analysis" by "weighing the relative value and complexity of the issues presented and the amount of time the parties devoted to each issue" to determine the issues' relative "significance." *Oak Forest*, 116 N.E.3d at 345. A party who prevails only on issues that were relatively insignificant in the full context of the case is not a prevailing party entitled to its attorneys' fees. *See id.*; *Powers*, 761 N.E.2d at 241-42. "Whether either party prevailed," *Powers*, 761 N.E.2d at 241, and "[w]hether and in what amount to award attorney fees," *Med+Plus*, 726 N.E.2d at 694, are matters committed to the trial court's discretion. *See Peleton, Inc. v. McGivern's Inc.*, 873 N.E.2d 989, 993 (Ill. App. Ct. 2007) (citing *Powers* 761 N.E.2d at 241).

Several precedents provide examples of situations in which both parties prevailed on significant issues, and the significance of the issues was relatively closely balanced, so the outcome was a "draw," and neither party was entitled to fees. In *Peleton*, a sublessee sued its sublessor and lessor, seeking, among other relief, (1) a declaration that it had exercised its option to extend its sublease through a date certain, and (2) damages against the sublessor for tortious interference with contract. The sublessee prevailed on the declaratory claim regarding the extension of its sublease, but it did not prevail on the tortious interference claim. The trial court denied the sublessee's motion for attorney fees, and the Illinois Appellate Court affirmed, reasoning as follows:

> In essence, the trial court's decision gave each side something: [the sublessee] could remain on the subject premises; and [the sublessor] did not have to pay for alleged interference with contract. In its order . . . the trial court stated: "Neither is entirely free from fault here; neither is entirely to blame." With each side prevailing on a significant issue, this court cannot find that the trial court abused its discretion in refusing to award attorney fees to [the sublessee].

*Peleton*, 873 N.E.2d at 994-95; *see Brown & Kerr, Inc. v. Am. Stores Properties, Inc.*, 715 N.E.2d 804, 813 (Ill. App. Ct. 1999) (affirming trial court's decision that "neither [party] can be said to have been the prevailing party" because "[t]hey both won and lost on claims in the proceedings below") (citing *Raffel*, 139 F.3d at 1147).

*Peleton* relied heavily on *Powers*, in which a landlord sued a tenant operating a gas station, seeking (1) termination of the lease due to environmental contamination from spillage, (2) an order requiring the tenant to remediate the environmental contamination, and (3) an order requiring the tenant to remove items and repair damage caused by the installation of items outside the scope of the lease. First, the trial court found that the spillage did not amount to a "material breach of the contract that would justify [the landlord] to terminate the tenancy." 761 N.E.2d at 239. Second, the court ordered the tenant to complete remediation efforts, which the tenant had already begun, by a date certain. Third, it ordered the tenant to pay $875 to repair damage to the siding of the building caused by the installation of pay phones, which the tenant had installed without written permission. The trial court awarded fees to the landlord, but the appellate court reversed, explaining that "[t]he most significant issue at trial involved environmental contamination," and on that issue "the trial court's rulings . . . were essentially a draw." *Id.* at 242. The trial court had found that the contamination was not a material breach that justified termination of the lease; instead, it entered only a "prospective" ruling requiring the tenant to complete the remediation by a date certain, which it was already on track to do. *Id.* Thus, the tenant was "required to do nothing

35

it had not already agreed to do, and [the landlord] received only the assurance that [the tenant] would continue the remediation efforts already begun." *Id.* The ruling did "little more than maintain the status quo." *Id.* As for the judgment for damages resulting from the pay telephones, it was "not significant relative to either the value of the remaining claims, their complexity, or the time devoted to the other issues at trial." *Id.*; *see Oak Forest*, 116 N.E.3d at 345 (when landlord and tenant both sought six-figure judgments for breach of contract, but trial court only awarded $3,403.60 to the tenant for the return of a security deposit, neither party was entitled to attorneys' fees as prevailing party).

Next, in *Med+Plus*, an employer succeeded in demonstrating that its former employee breached his employment contract by resigning before his contract term expired; but the employee succeeded in demonstrating that the employer had not proven any actual damages and that the contract's liquidated damages provision was unenforceable. The trial court ruled that both parties prevailed on significant issues, so they should bear their own attorneys' fees. The Illinois Appellate Court affirmed, explaining as follows:

> Here, plaintiff received a judgment that defendant breached the employment agreement. Similarly, defendant succeeded on plaintiff's damages claims; the liquidated damages provision was held to be unenforceable, and plaintiff failed to prove the existence of any actual damages. Accordingly, we hold that the trial court's determination not to award attorney fees was not an abuse of discretion, as both parties were successful on significant issues in the action.

*Med+Plus*, 726 N.E.2d at 694.

Similarly, in *Raffel*, a landlord sued his tenant in a dispute over when the lease term ended, seeking unpaid rent of $9,584.86, a late payment fee, and an additional $81,648 under a "conditional rent abatement" clause. The landlord prevailed as to the unpaid rent and late payment fee, but the tenant prevailed on the issue of the "conditional rent abatement" clause, which, the

36

tenant successfully argued, was unenforceable because it amounted to an unlawful penalty provision. 139 F.3d at 1144. The trial court awarded fees to neither party because the case was a "draw." *Id.* at 1145. The Seventh Circuit agreed, reasoning that the most significant issue in the case was the issue of whether the conditional rent abatement clause was an unlawful penalty, and the tenant won on that issue; but the landlord won on the issue of when the lease term ended and the unpaid rent, so it also prevailed on a significant issue. *Id.* at 1147.

After hearing the evidence at trial, the Court is now in a position to weigh the "relative value and complexity of the issues presented." *See Oak Forest*, 116 N.E.3d at 345. The Court concludes that this case is best characterized as one in which both parties prevailed as to significant issues, so the case is essentially a draw, and the parties should bear their own attorneys' fees.

First, AGH prevailed by establishing that Freedman breached the settlement agreement by soliciting Zach Hughes's employment and obtaining a permanent injunction prohibiting him from breaching his restrictive covenants again in the future. While AGH did not establish any damages for Freedman's breach, the injunction was a meaningful benefit to AGH that provided relief on a significant issue. The evidence shows that enforcing the restrictive covenants was a significant issue in this case from the very beginning. In fact, the restrictive covenants were essentially the reason this case was filed in the first place: AGH insisted on including them in the paperwork documenting its purchase of Freedman's shares of stock, and Freedman balked at them, instead filing this suit based on his position that the parties had reached an enforceable agreement without them. Further, the evidence showed that Freedman was not entirely serious or scrupulous about sticking to his obligations under the settlement agreement's restrictive covenants, so the injunction had a tendency to modify his behavior in a way that benefited AGH. *See Lefemine v. Wideman*,

37

568 U.S. 1, 4 (2012). While there may be some evidence that he and his agents were mindful of the restrictive covenants (assuming it is true that Freedman declined the 1803/Redemption investment opportunity because he had been advised that it would violate them and inferring that Max never signed the Agency Agreement for the same reason), the Court credits Zach Hughes's testimony that Freedman was prepared to flout both his and Zach Hughes's covenants with AGH by hiring Zach Hughes to work with Max. AGH could not have known if Freedman had serious plans to poach its employees and use their skills for his own benefit and to AGH's detriment, and neither the settlement agreement (which did not require proof of actual damages for injunctive relief) nor the law required AGH to wait till any such plans came to fruition, demonstrably harming AGH's business, before taking action to enforce the restrictive covenants. *See generally Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). Thus, the permanent injunction in the Agreed Order was meaningful relief that represented success for AGH on a significant issue, like the order permitting the sublessee to remain on the premises in *Peleton* or the ruling in favor of the landlord on the unpaid rent and late fee in *Raffel*. It was akin to—but slightly more significant than—the order requiring the tenant to complete remediation in *Powers*; as in *Powers*, it preserved the "status quo," 761 N.E.2d at 242, although it did so under circumstances in which the status quo appeared to be under some threat, even if that threat had not yet manifested.

Had AGH stopped at obtaining the permanent injunction, the attorneys' fees issue might come out differently. But the Agreed Order specifically contemplated that AGH would file an amended pleading to assert a material breach of the settlement agreement, and the Second Amended Counterclaim followed. There was a lot at stake in the material breach claim; if

successful, AGH would have been able to save millions of dollars by avoiding the remaining payments due on the notes held by Freedman. In fact, Freedman argues that AGH's main purpose in reinstating this case was always to find a way to establish a material breach so it could avoid paying what it owed him. In that regard, it may be telling that AGH made no effort to ensure Freedman's compliance with the restrictive covenants before filing its motion to reinstate this case. (*See* AGH Resp. to Freedman's Proposed Findings of Fact ¶ 88, ECF No. 407 ("On January 19, 2018, American Guardian, at Freedlund's direction and *without sending a cease and desist letter or making any effort to contact Freedman*, filed a motion for preliminary injunction using Zach's affidavit as support. Response: Undisputed.") (emphasis added).) AGH presumably could have sent a cease-and-desist letter or otherwise attempted to remind Freedman of his obligations under the settlement agreement short of reinstating this litigation, but it did not. Instead, it filed a motion to reinstate and, in the same motion, sought expedited discovery to establish other breaches. Although discovery did not reveal other breaches, and even after securing an injunction compelling Freedman to abide by the settlement agreement's restrictive covenants, AGH persisted in attempting to establish a material breach. However, despite a significant investment of time and effort, including oversize briefs and voluminous documentary evidence, AGH's motion for summary judgment on the material breach issue was unsuccessful, and, seeing the writing on the wall, AGH subsequently abandoned the issue. The Court concludes that, in light of the above considerations, the material breach issue was at least as significant an issue in this case as ensuring Freedman's compliance with his restrictive covenants. Thus, like the tenant in *Powers* who defeated a material breach claim, the employee in *Med+Plus* who avoided paying damages, the sublessor in *Peleton* who avoided paying damages, and the tenant in *Raffel* who avoided paying

the penalty, Freedman succeeded on a significant issue by defending against AGH's material breach claim and avoiding the significant financial consequences he would otherwise have suffered.

In summary, AGH prevailed by obtaining injunctive relief to protect against further breaches of the restrictive covenants, and Freedman prevailed by defeating the material breach claim and protecting the remaining payments due to him under the settlement agreement. Both parties prevailed on significant issues here, and, on balance, the outcome of the case was essentially a "draw." *Powers*, 761 N.E.2d at 242; *see Raffel*, 139 F.3d at 1147, *Oak Forest*, 116 N.E.3d at 345-46. As the *Peleton* court put it, "[n]either [party] is entirely free from fault," and "neither is entirely to blame," 873 N.E.2d at 995. Therefore, the Court concludes that, as in *Powers*, *Peleton*, *Med+Plus*, *Raffel*, and like cases, neither side is entitled to attorney fees as the prevailing party.

## III.   Other Relief

AGH concludes its brief by asking for the following declaratory relief:

- o   Freedman breached the Settlement Agreement;
- o   As a result of Freedman's breach, American Guardian is excused from providing Freedman with financial statements;
- o   As a result of Freedman's breach, the Restricted Period in the Settlement Agreement shall be extended by 27 months, approximately the amount of time between American Guardian's reinstatement of this litigation and trial;
- o   American Guardian is entitled to an offset under the $3 million note of all losses, liabilities, costs, expenses, and damages it incurred to enforce the Settlement Agreement through the reinstated litigation, in an amount to be determined in a separate proceeding; and
- o   American Guardian is the substantially prevailing party in the reinstated litigation and entitled to its reasonable attorney's fees and costs, in an amount to be determined in a separate proceeding.

(AGH Proposed Findings of Fact and Conclusions of Law at 42-44, ECF No. 403.) The Court has already addressed the first and fifth items. Freedman argues that AGH has provided no basis for

the other three items, and the Court agrees.

First, AGH makes no argument for why the Court should excuse AGH's contractual obligation to provide Freedman with financial statements, when AGH has not yet made all payments due under the settlement agreement. AGH has not prevailed on its material breach claim, and it is not excused from its contractual obligations based on the breach it has proven, which, so far as the evidence shows, caused no concrete harm.

AGH also offers no argument to explain why the Court should extend the restricted period. There is at least a potential contractual basis for this relief: section 2(C) of the settlement agreement provides that, in the event of a breach of the restrictive covenants, the time during which the covenants remain in force is to be "extended by a period of time equal to the period of time during which Max or the Freedmans are in violation" of them. (DTX 11 § 2(C).) AGH has only proven that Freedman breached the settlement agreement more or less momentarily by soliciting Zach Hughes's employment at the December 16, 2017 breakfast meeting. The breach was over almost soon as it had begun, so no extension of the restricted period is warranted.

Finally, AGH asks for an offset to the $3 million note that remains outstanding. As Freedman correctly argues, AGH never asked for this relief in its reinstatement motion or the Second Amended Counterclaim, so the Court could not award it, even if the facts warranted it. But in any case, the Court is not awarding AGH any financial relief, so there is nothing to offset against the remaining note. For those two independent reasons, no offset is appropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court declares that (1) Freedman breached the settlement agreement by soliciting the employment of Zach Hughes, and (2) neither party is entitled to attorneys' fees as the substantially prevailing party in this case. Judgment shall enter. Civil case terminated.

**SO ORDERED.**                                      **ENTERED: August 9, 2021**

_____
**HON. JORGE ALONSO**
**United States District Judge_**